Alvah R. DANIEL, Jr., Appellant
(Defendant),

v.

The STATE of Wyoming, Appellee
(Plaintiff).

No. 5553.

Supreme Court of Wyoming.

April 28, 1982.

Richard D. Honaker, Cheyenne, and W. Keith Goody, Asst. Public Defender, Jackson, for appellant.

Steven F. Freudenthal, Atty. Gen., Gerald A. Stack, Deputy Atty. Gen., Crim. Div., Allen C. Johnson, Sr., Asst. Atty. Gen., Michael L. Hubbard, Asst. Atty. Gen., Cheyenne, Jere Ryckman, County Atty., and Robert J. Reese, Deputy County Atty., Green River, for appellee.

Before ROSE, C. J., and RAPER, THOMAS, ROONEY and BROWN, JJ.

BROWN, Justice.

A jury found appellant guilty of involuntary manslaughter.[1] The district judge sentenced appellant to a term in the penitentiary of not less than 19 years and not more than 20 years.

The issues urged on appeal are:

"1. Under the facts of this case, did police officers violate the Appellant's federal and state constitutional rights to counsel, against self-incrimination, and to due process of law by obtaining statements from him after he made several inquiries about his right to counsel and the police ignored those inquiries?

2. Under the facts of this case, did the trial court abuse its discretion by sentencing Appellant to 19–20 years for the offense of involuntary manslaughter, and does such a severe sentence, under the facts of this case violate federal and state

---

1. Appellant was charged in the information with three alternate counts of murder in the first degree in violation of § 6–4–101(a), W.S. 1977:

"Whoever purposely and with premeditated malice, or in the perpetration of, or attempt to perpetrate any rape, sexual assault, arson, robbery or burglary, or by administering poison or causing the same to be done, kills any human being, or whoever purposely and with premeditated malice kills any peace officer, corrections employee or fireman acting in the line of duty, is guilty of murder in the first degree."

Appellant was also charged with kidnapping in violation of § 6–4–201, W.S.1977.

bans on cruel and unusual punishment and Art. 1, § 15 of the Wyoming Constitution?"

We will affirm.

Helen Bunning, an instructor at Western Wyoming College, died from a stab wound received at the college during the early afternoon of September 17, 1980. On September 19, 1980, appellant presented himself at the office of the Rock Springs Chief of Police, Russell G. Hawk. Appellant told Chief Hawk's secretary the purpose of his visit to the police department, and the secretary then told the Chief that there was an individual who said he was an eyewitness to the stabbing at the college. Chief Hawk agreed to talk to the individual, and asked the secretary to have some investigators come into the office. The appellant then went into the Chief's office with his wife and children and said that he was responsible for the accident at the college. The Chief asked the appellant if he was talking about the lady who was stabbed, and appellant responded by saying that he was totally responsible for the accident.

Before any questioning by police, appellant had already confessed to killing Helen Bunning accidentally, the crime of which he was convicted. The Chief then advised appellant of his *Miranda* rights and asked for a recorder. There was no further conversation until Officers Ellis and Grymes came into the Chief's office with the recorder. Conversations, questions and answers thereafter were recorded. The Chief asked appellant some preliminary questions, such as correct name and complete address, then reviewed with appellant and the other officers what appellant had previously told him. Appellant did not disagree with the Chief's narration, but emphasized that the stabbing was an accident.

Near the beginning of the interview Chief Hawk told appellant that based on what he had initially said, appellant would be taken into custody and charged with homicide. The Chief said that appellant would be arrested whether or not he made a statement. Early in the interview appellant said he would "probably like to have an attorney present." Appellant never said unequivocally that he wanted an attorney present. There was considerable discussion about appellant's right to an attorney. Appellant said, "If it's necessary, that's because I just don't want to be taken advantage of or anything like that." Chief Hawk told appellant that he would not talk to him further unless he was willing to waive his rights. The appellant said: "Well, I'd just as soon get it taken care of. I waive the right to—" (Chief Hawk interrupted appellant in mid-sentence). At this juncture a waiver form was provided. Chief Hawk prefaced the reading of the waiver saying, "And I'd rather not have the information if it means violating your rights." Appellant was furnished a copy of the waiver form and Officer Grymes proceeded to read the waiver as follows:

"POLICE OFFICER: Okay, sir. These are your rights guaranteed under the Constitution. Before we ask you any questions, you have to understand your rights, okay?

"MR. DANIEL: Okay.

"POLICE OFFICER: You have the right to remain silent. Understand that?

"MR. DANIEL: Yes, sir.

"CHIEF HAWK: And, it's 2:22 in the afternoon on September 19, 1980.

"POLICE OFFICER: Okay. Let's see. I'll go over that again. You have the right to remain silent. Anything you say can be used against you in Court. Do you understand, that, sir?

"MR. DANIEL: Yes, sir.

"POLICE OFFICER: You have the right to talk to a lawyer for advice before we ask you any questions, and to have him with you during questioning. Do you understand that, sir?

"MR. DANIEL: Yes, sir.

"POLICE OFFICER: If you cannot afford a lawyer, one will be appointed for you before any questioning, if you wish. Do you understand that, sir?

"MR. DANIEL: Yes, sir.

"POLICE OFFICER: If you decide to answer questions now, without a lawyer present, you will still have your right to

stop answering at any time. You also have the right to stop answering at any time until you talk to a lawyer. Do you understand that, sir?

"MR. DANIEL: Yes, sir.

"CHIEF HAWK: Now, you have answered 'Yes, sir,' to all of these questions. Okay, would you ask—

"POLICE OFFICER: Okay, what I would like to do now is ask for a waiver.

"CHIEF HAWK: In other words, the waiver being that you have read this statement. So, would you read it again now that you have answered all the questions with Mr. Grymes reading it?

"POLICE OFFICER: If you would just read that waiver and if you have any questions about it.

"MR. DANIEL: May I still—if I can't afford a lawyer—may I still be appointed a lawyer?

"CHIEF HAWK: Well, we wouldn't talk to you at the point that you want to have an attorney. We would discuss it with you now. You do have the right to have representation now, not only at this time, but later on in the thing. That's just if you want an attorney, we're not going to talk to you right now. We are just going to put you in the bucket and shut things down.

"MR. DANIEL: Okay.

"CHIEF HAWK: And, that's whether you make a statement or not.

"POLICE OFFICER: Okay, that—you don't, by signing this waiver, you don't waive your rights.

"MR. DANIEL: I just waive the right.

"POLICE OFFICER: While we are talking now, if you agree to it, okay? But, if at any point, you want to get an attorney; if you want to stop talking—whatever you want—you are the man who makes the decisions, not us. That's what it comes down to.

"MR. DANIEL: Well, I'd like to talk. I'd like to explain my side of the story right now.

"CHIEF HAWK: Yes.

"POLICE OFFICER: Okay, if you would—

"CHIEF HAWK: I've got this one filled out a little bit for you, and while I am filling this one out, would you read me that waiver of rights down here?

"MR. DANIEL: I have read this statement of rights, and I understand what my rights are. I am willing to make a statement and answer questions. I do not want a lawyer at this time. I understand and know what I am doing. No promises or threats have been made to me or coercion (mispronounced)—

"CHIEF HAWK: Coercion.

"MR. DANIEL: —coercion has been used against me.

"CHIEF HAWK: That's like a threat or something along that line. Okay, with that in mind, would you sign your full name right here?

"Okay, without any interruptions or anything else from us, would you go back and start with about the time and date that this incident started, and go right on through, and we will not even ask you any questions until you get finished. Then, we will ask you what questions we've got concerning it."

There is no question that appellant's initial confession that he was totally responsible for the stabbing death of Helen Bunning was admissible. Appellant was not in custody. Before his volunteered statement, the only thing Chief Hawk knew was that Alvah Daniel claimed to be an eyewitness to the incident. He did not know that Mr. Daniel had killed Mrs. Bunning, and any suggestion that Chief Hawk tricked the appellant into confessing is not supported by the record. Furthermore, Chief Hawk had no obligation to stop the confession and advise the appellant of his constitutional rights. Out of an abundance of caution, Chief Hawk took it upon himself to terminate the first volunteered confession of the appellant, thereby choosing to protect the appellant from further incrimination. Under any view of the facts here, the initial confession of the appellant was admissible. *Lung v. State*, Okla., 420 P.2d 158 (1966).

After appellant made his initial confession, the police conducted no express questioning regarding the incident until after appellant had been advised of his rights twice and until after he had read and signed a waiver form. Appellant, however, had been taken into custody, and although he had not been formally placed under arrest, he was told he would be arrested for homicide. He therefore knew that he was not free to leave the police station.

## I

The genesis of the large body of law developed in the last fifteen years with regard to custodial interrogation is *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), cert. denied 396 U.S. 868, 90 S.Ct. 140, 24 L.Ed.2d 122 (1969). *Miranda* set forth proscriptions and limitations mandated by the Fifth and Sixth Amendments to the United States Constitution regarding custodial interrogation. The Supreme Court in *Miranda* held that the Constitution mandates that, "no person * * * shall be compelled in any criminal case to be a witness against himself," and that "the accused * * * have the assistance of counsel." The Supreme Court, however, also said:

" * * * The fundamental import of the privilege while an individual is in custody is not whether he is allowed to talk to the police without the benefit of warnings and counsel, but whether he can be interrogated. There is no requirement that police stop a person who enters a police station and states that he wishes to confess to a crime, or a person who calls the police to offer a confession or any other statement he desires to make. * * * " *Miranda v. Arizona*, supra, 384 U.S. at 478, 86 S.Ct. at 1630, 16 L.Ed.2d at 726.

■ Special procedural safeguards are not required where the suspect is simply taken into custody, but rather where a suspect in custody is subjected to interrogation. In the recent case of *Rhode Island v. Innis*, 446 U.S. 291, 300–301, 100 S.Ct. 1682, 1689–1690, 64 L.Ed.2d 297, 307–308 (1980), the Court mandated:

" * * * 'Interrogation,' as conceptualized in the *Miranda* opinion, must reflect a measure of compulsion above and beyond that inherent in custody itself.

"We conclude that the *Miranda* safeguards come into play whenever a person in custody is subjected to either express questioning or its functional equivalent. That is to say, the term 'interrogation' under *Miranda* refers not only to express questioning, but also to any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect. The latter portion of this definition focuses primarily upon the perceptions of the suspect, rather than the intent of the police. * * * "

■ In the present case, the police conducted no express questioning regarding the incident until after the second reading of the *Miranda* warnings and after appellant had read and signed the waiver form. Furthermore, before the second reading of the *Miranda* warnings, the police did not say or do anything which they should have known was reasonably likely to elicit an incriminating response. Appellant admitted that no one pressured him to talk at any time. Consistent with the rule in *Rhode Island v. Innis*, supra, the appellant here was not subjected to "interrogation" until after the *Miranda* warnings had been given twice and he had signed the waiver.

Because of appellant's unclear desires regarding an attorney, there was considerable discussion about his right to an attorney and the waiver of that right. After considering the entire conversation in context, including the tapes and the transcript, we believe that appellant initiated conversation and provoked further inquiry regarding waiving his right to an attorney. Chief Hawk said, "But we won't talk to you about the thing unless you are willing to waive your rights." Appellant said, "Well, I'd like to get it taken care of you know." Chief Hawk said, "I'm not going to try or want to take advantage of you." Appellant inter-

rupted and said, "Well, I'd just as soon get it taken care of. I waive the right to—."

There is no real question here of appellant changing his mind; he never made up his mind until he said, "I'd like to explain my side of the story right now." With that statement he indicated he had made up his mind to waive his right to an attorney. In *Johnson v. Zerbst*, 304 U.S. 458, 464, 58 S.Ct. 1019, 1023, 82 L.Ed.2d 1461, 1466, 146 A.L.R. 357 (1938), the Court maintained:

" * * * A waiver is ordinarily an intentional relinquishment or abandonment of a known right or privilege. The determination of whether there has been an intelligent waiver * * * must depend, in each case, upon the particular facts and circumstances surrounding that case, including the background, experience, and conduct of the accused."

Appellant here was 25 years old, and had obtained the equivalent of a high school education. He was a member of the iron workers union and felt himself competent to enter an apprenticeship. He was fully advised of his rights at least twice before police questioning and acknowledged that he understood each of the individual rights. He was coherent and aware of what he was doing. His waiver was voluntarily and knowingly made.

Appellant states in his brief that the resolution of the issue presented here will turn upon the recent "remarkable" case of *Edwards v. Arizona*, 451 U.S. 477, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981). He also speaks of "the bold, new holding of the court." We would eliminate the adjectives "remarkable" and "bold." The adjective "recent" is sufficiently descriptive of the *Edwards* case. The holding in *Edwards v. Arizona*, supra, that provoked ecstasy in appellant was reference to a distinction between police-initiated and defendant-initiated conversation taking place after an accused has invoked his constitutional right to counsel.

The Court said:

" * * * Although we have held that after initially being advised of his *Miranda* rights, the accused may himself validly waive his rights and respond to interrogation, * * * the Court has strongly indicated that additional safeguards are necessary when the accused asks for counsel; and we now hold that when an accused has invoked his right to have counsel present during custodial interrogation, a valid waiver of that right cannot be established by showing only that he responded to further police-initiated custodial interrogation even if he has been advised of his rights. We further hold that an accused, such as Edwards, having expressed his desire to deal with the police only through counsel, is not subject to further interrogation by the authorities until counsel has been made available to him, unless the accused himself initiates further communication, exchanges, or conversations with the police." *Edwards v. Arizona*, supra, 451 U.S. at 484–485, 101 S.Ct. at 1884, 68 L.Ed. at 386.

If it is difficult for the police officer to determine whether a suspect indeed intends to invoke his right to have an attorney present, the officer may seek clarification of the suspect's desires, as long as he does not disguise the clarification as a subterfuge for coercion or intimidation. *Giacomazzi v. State*, Alaska, 633 P.2d 218 (1981). That is what occurred here. We see no trickery or subterfuge, and appellant admits that he was under no pressure by the police. We do not think the police did anything in the case at bar proscribed by *Edwards*. There are factual distinctions in the two cases. In *Edwards* the accused was unequivocal; he said, "I want an attorney before I make a deal." Again, here appellant never did say unequivocally that he wanted a lawyer. This alone was justification for the police to inquire further concerning his desires.

Appellant also seeks solace in *Dryden v. State*, Wyo., 535 P.2d 483 (1975). Dryden held that after a defendant indicated that he wanted an attorney, "the county authorities could not thereafter enter into other interrogation unless and until the defendant had himself reopened the subject."

*Dryden v. State*, supra, at 493.[2] This case here, however, is distinguishable from Dryden in at least three particulars. No further interrogation took place until appellant signed a waiver; appellant never did say without qualification that he wanted an attorney; and appellant initiated and provoked further inquiry at the time he waived his right to an attorney.

■ Appellant seems to be contending that because the police did not stop questioning him after he mentioned the word "lawyer," that everything he said after that should have been excluded. It must be remembered that appellant was charged with first degree murder, but convicted only of involuntary manslaughter. The initial confession, together with a profusion of other evidence, including the results of a polygraph test,[3] was more than sufficient to uphold the jury's conviction of involuntary manslaughter. The evidence that appellant objects to is mostly exculpatory. Ironically, it is largely the same evidence that appellant relied on at trial in his successful attempt to avoid conviction of murder. This evidence was to his benefit at trial, but now he claims that it should not have been admitted. We disagree.

## II

Following the jury's verdict finding appellant guilty of involuntary manslaughter, the Probation and Parole Department conducted an extensive investigation and submitted a detailed report to the district court. At the sentencing hearing appellant produced two witnesses and addressed the court personally. Counsel for both parties also addressed the court. From the report and the hearing, the trial judge was thoroughly advised concerning the appellant's background and was aware of any mitigating considerations. The court sentenced appellant to a term of not less than 19 nor more than 20 years in the Wyoming State Penitentiary. Appellant asserts that this sentence was an abuse of discretion because the trial judge did not follow any sentencing standards and did not state his reasons for the sentence.

In recent years we have been asked to review sentences in numerous cases. In *Scheikofsky v. State*, Wyo., 636 P.2d 1107 (1981), we said, "We have an abiding reluctance to review a trial judge's determination of sentence. The determination is a burdensome decision which no trial judge could lightly make and which we will not lightly overturn."

In *Jones v. State*, Wyo., 602 P.2d 378, 380 (1979), we said:

"The law in Wyoming is that the sentencing judge is given wide discretion in determining the length and conditions of the term of imprisonment to be imposed upon conviction and that such determination, if within the statutory limits, will not be disturbed absent a clear abuse of discretion."

■ Wyoming has a system of indeterminate sentencing,[4] which carries with it an implicit adoption of the philosophy of individual sentencing. This system of indeterminate sentencing necessitates the granting of broad discretion to the trial judge, who must choose from the sentencing alternatives and the range of permissible penalties.

---

2. We said earlier in this opinion that we did not necessarily agree with appellant that *Edwards v. Arizona*, supra, was a "remarkable case," nor did it articulate a "bold new holding." This court in *Dryden v. State*, supra, six years before Edwards, anticipated the Edwards holding. In *Edwards*, supra, the Supreme Court did not quote Dryden. Perhaps they should have.

3. In advance of trial appellant stipulated that the results of a polygraph test be admitted in evidence. Appellant personally signed the stipulation.

4. Section 7–13–201, W.S.1977:

"When a convict is sentenced to the state penitentiary, otherwise than for life, for an offense or crime, the court imposing the sentence shall not fix a definite term of imprisonment, but shall establish a maximum and minimum term for which said convict shall be held in said prison. The maximum term shall not be longer than the longest term fixed by law for the punishment of the offense of which he was convicted, and the minimum term shall not be less than the shortest term fixed by law for the punishment of the offense of which he was convicted."

In *Sanchez v. State*, Wyo., 592 P.2d 1130 (1979), this Court vacated the sentence and remanded the matter for further sentencing proceedings. That decision was based on the trial judge's failure to consider probation before sentencing. In that decision, this Court directed that the American Bar Association Standards for Criminal Justice, Probation, and other sources "be given proper consideration where probation is considered as an alternative to incarceration." [5] Here appellant made a strong plea for probation and his petition was denied.

We have also said that in the imposition of a criminal sentence, the judge in exercising his judicial discretion should give consideration to all circumstances, aggravating as well as mitigating. *Cavanagh v. State*, Wyo., 505 P.2d 311, 312 (1973). The trial court here weighed and considered all the circumstances very carefully.

In other jurisdictions a number of cases have been remanded for further sentencing proceedings under circumstances not found here. For example:

" * * * where a sentence was imposed upon the basis of (1) misinformation of constitutional magnitude, such as an inaccurate criminal record, *Townsend v. Burke*, 334 U.S. 736, 741, 68 S.Ct. 1252, 92 L.Ed. 1690 (1948), (2) a record comprising prior unconstitutional convictions, e.g., *United States v. Tucker*, 404 U.S. 443, 92 S.Ct. 589, 30 L.Ed.2d 592 (1972), (3) the effect of a simultaneous sentence and conviction upon a more serious count of the indictment, which was later invalidated, *McGee v. United States*, 462 F.2d 243 (2d Cir. 1972), or (4) failure of the court to receive and consider mitigating circumstances, *United States v. Malcolm*, 432 F.2d 809, 818 (2d Cir. 1970)." *United States v. Brown*, 479 F.2d 1170, 1173 (2d Cir. 1973).

The appellant also complains that the trial judge did not give his reasons for imposing a sentence of not less than 19 years nor more than 20 years. We cannot improve on what Justice Roberts said in *Commonwealth v. Riggins*, 474 Pa. 115, 377 A.2d 140, 147 (1977), regarding why trial judges should explain their reasons for the sentence imposed.

"The benefits of requiring the trial court to state its reasons for the imposition of its sentence are manifold: First, requiring the trial court to articulate its reasons for selecting a sentence will promote more thoughtful consideration of relevant factors and will help rationalize the sentencing process. It will safeguard against arbitrary decisions and prevent consideration of improper and irrelevant factors. It will minimize the risk of reliance upon inaccurate information contained in the presentence report. A statement of reasons may aid correction authorities if the sentence results in a commitment, and may have therapeutic value if the sentencing judge explains his or her reasons to the defendant. Requiring a trial court to provide a reasoned basis for the sentence imposed may enhance the court's legitimacy as perceived by judges themselves and participants in the criminal justice system. It will aid courts in attaining their institutional objective of dispensing equal and impartial justice and will demonstrate to society that these goals are being met. Reasoned sentencing decisions may encourage the development of sentencing criteria and reduce disparity in sentences—decreasing the number of unusually lenient as well as unusually harsh sentences. Finally, a statement of reasons will be invaluable in aiding appellate courts to ascertain whether the sentence imposed was based upon accurate, sufficient and proper information."

See also, *People v. Watkins*, Colo., 613 P.2d 633, 637, n. 14 (1980).

---

5.    " * * * We do not suggest that these are the only sources district courts should look to for guidance or that they should consider themselves bound thereby. We direct only that they be given proper consideration where probation is considered as an alternative to incarceration." *Sanchez v. State*, Wyo., 592 P.2d 1130, 1137 (1979).
See American Bar Association Standards for Criminal Justice Sentencing Alternatives and Procedures, §§ 18–1.1—18.8.2 (2nd Ed. 1980).

■ We strongly recommend that the trial judges explain their reasons for denying probation and indicate the factors they considered in imposing sentence.

■ Appellant asserts that his sentence is greatly out of proportion to the average sentence for involuntary manslaughter in Wyoming. We are not committed to absolute uniformity in sentencing.

" * * * We note counsel's insistence that defendant was treated differently from other persons charged with the same offense. In the first place, the record does not bear this out. Even so, neither the Fourteenth Amendment of the United States Constitution nor Art. 1, § 2, Wyo. Const., requires exact equality. Only arbitrary and invidious discrimination are condemned, neither of which are present in this case." *State v. Cavanagh*, supra, at 312.

The circumstances of each crime are different. The background of each convicted person is different and his rehabilitative needs are different. Also, the potential of each convict to be a productive member of society is different. Were we to require uniformity in sentencing and be guided by statistics, we would, in effect, mandate sentencing by computer. We will not substitute our own judgment for that of the sentencing judge unless the latter has clearly abused his discretion.

■ In the case here the trial judge had the benefit of a comprehensive presentence report and the testimony of witnesses at the sentencing hearing. He knew much more about the background of appellant than a judge would ordinarily know. It would not add anything to this opinion to detail the positive and negative aspects of appellant's background; suffice it to say the negative outweighed the positive. Appellant emphasized at sentencing that he was family oriented. We do not find it unusual for a defendant who is about to be sentenced to be concerned about his family. To paraphrase a proverb: [6] A man is rarely

seen with his wife except when he is about to be sentenced. The trial judge apparently felt that the appellant would profit by a structured rehabilitation environment. We do not disagree.

We see no abuse here. The sentence was within the limits provided for by law. The sentencing judge agonized over this sentence after giving careful consideration to mitigating matters. This sentence was not imposed without careful thought and the marshaling of a great volume of facts.

Affirmed.

ROSE, Chief Justice, specially concurring.

Although I agree with the majority that appellant's conviction and sentence must be affirmed, I do so for completely different reasons than those expressed in the majority opinion. First, my review of the record convinces me that the trial court erred in failing to suppress statements made by appellant which were, according to my view, obtained in violation of his *Miranda* rights.[1] Even so, and for reasons that I will later explain, I cannot conclude that the admission of those statements prejudiced him. With respect to the inordinately severe sentence imposed on appellant, I concur with the majority only because the applicable law gives me no alternative. In concurring, I reiterate the position I took in *Scheikofsky v. State*, Wyo., 636 P.2d 1107, 1113 (1981), concerning the need for this court to review the sentencing aspect of criminal proceedings more carefully.

### THE MIRANDA QUESTION

I have no quarrel with the conclusion reached by the majority concerning the propriety of the admissibility of appellant's initial statement to the authorities. When appellant Daniel entered the police chief's office and informed him that he was responsible for the accidental death of Helen Bunning, Mr. Daniel thereby made a volun-

---

6. "A man is rarely seen with his wife except when he is about to be indicted or is running for public office."

1. *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694, 10 A.L.R.3d 974 (1966).

tary statement which implicated him in the crime. As noted by the majority, such admissions fall outside of the proscriptions of *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694, 10 A.L.R.3d 974 (1966), and are admissible in a subsequent criminal prosecution.

My dispute with the majority focuses on their affirmance of the trial court's decision to admit appellant's later declarations to the police in the statement-taking process. In the majority view, these utterances became admissible because they were obtained after appellant had knowingly and intelligently waived his constitutional rights as these rights are guaranteed by the 5th and 6th Amendments to the United States Constitution and Art. 1, § 11 of the Wyoming Constitution. I disagree with this conclusion because the challenged statements were, in my judgment, obtained in violation of appellant's rights as identified by *Miranda v. Arizona*, supra, *Edwards v. Arizona*, 451 U.S. 477, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981), and *Dryden v. State*, Wyo., 535 P.2d 483 (1975).

In support of my position in this respect, it is necessary for me to clarify and enlarge upon the statement of the facts surrounding the taking of appellant's statement. I do this because I believe the majority opinion fails to capture all of the relevant facts—fails to capture the flavor and the tenor of the conversations that took place— fails to perceive accurately what Mr. Daniel in fact said to the police. The result is that the reader of the majority opinion is given an inexact impression as to what really transpired at the police station.

The majority suggests that appellant first spoke to the Rock Springs Police Department and implicated himself in the death of the victim—which is true. Then, upon realizing that probable cause for an arrest existed, the Chief read to the appellant his *Miranda* rights and all conversation ceased until two other officers arrived in order to begin the tape-recorded interview. It is then suggested that appellant was again read and explained his *Miranda* rights and given the opportunity to waive those

rights, which he did voluntarily, and, presumably, with a full understanding of the consequences of the waivers. This synopsis of the facts describes a suspect willing and ready to talk after proper guidance and assistance are given by the police in explaining the constitutional rights which he is entitled to assert or waive and which rights he does in fact waive with a full understanding of the consequences.

My review of the record, however, convinces me that the picture painted in the majority opinion glosses over several important details that poignantly suggest a situation involving a suspect who asserts his right to counsel only to be later persuaded otherwise—i.e., argued out of it by the police officers involved. This is what occurred at the police station before the appellant gave his statement to the officers.

On September 19, 1980, appellant voluntarily went to the office of Police Chief Russell Hawk of the Rock Springs Police Department in order to turn himself in for the incident which resulted in Helen Bunning's death. Chief Hawk was informed by his secretary that an individual wanted to speak to him about the Bunning case, whereupon Mr. Daniel, together with his wife and children, was admitted to the Chief's office. Upon entering, Daniel said that he was responsible for the "accident" that occurred at the college. The Chief requested a clarification, after which it became clear that appellant was referring to the Bunning homicide. As the majority note, appellant confessed responsibility for the victim's death while at the same time claiming it was an accident. At this juncture, Chief Hawk gave appellant the *Miranda* warning. Immediately thereafter, Daniel said that he would "*probably like to have an attorney present.*" (Emphasis added.) This demand or request was absolutely ignored except that the Chief then ordered two officers to produce a tape recorder so that the interview could be recorded. Thus—contrary to the majority's view—appellant demanded an attorney or assistance of counsel *before* the taped interview began. This sequence of events is confirmed at the beginning of the taped portion:

"CHIEF HAWK:

"Yes—about 2:15 and told me that you were responsible for the accident to the woman. I asked you to clarify what accident, and you said, 'Where the woman was killed with the knife.' Is that correct?

"MR. DANIEL:

"Accidentally.

"CHIEF HAWK:

"Well, yes. That you were the only person that was involved and responsible for that?

"MR. DANIEL:

"Yes, sir.

"CHIEF HAWK:

"I *advised you of your legal rights and at that point you told me that you'd probably like to have an attorney present.*" (Emphasis added.)

Following this colloquy, appellant stated to Chief Hawk, "if it's necessary, because I just don't want to be taken advantage of or anything like that," and he received the following response from Chief Hawk:

"CHIEF HAWK:

"*Well, it's not necessary, and like I've told you, if you do waive your rights of having an attorney present,* and I've told your wife the same thing, that we would be willing to discuss—and let you just tell your story as to what happened. *If you are saying it's an accident, an attorney will tell you that's a self-serving declaration.* It's—but again, if you want to, you know, sit down, you've got to have your attorney here present if you're going to make a statement. I would tell you at this time, that with what information you've given us, it will be necessary for us to take you into custody, whether you make the statement or not." (Emphasis added.)

The above sequence of events convinces me that rather than assisting appellant, the Chief of Police, along with the other offi-cers, continually pressed appellant to waive the right to counsel for whose services he had earlier expressed a need. In short, the police talked him out of it. This is substantiated by the following interchange which occurred after one of the officers had read appellant his rights:

"CHIEF HAWK:

"Now, you have answered 'Yes, sir,' to all of these questions. Okay, would you ask—

"POLICE OFFICER:

"Okay, what I would like to do now is ask for a waiver.

"CHIEF HAWK:

"In other words, the waiver being that you have read this statement. So, would you read it again now that you have answered all the questions with Mr. Grymes reading it?

"POLICE OFFICER:

"If you would just read that waiver and if you have any questions about it.

"MR. DANIEL:

"*May I still—if I can't afford a lawyer—may I still be appointed a lawyer?*

"CHIEF HAWK:

"Well, we wouldn't talk to you at the point that you want to have an attorney. We would discuss it with you now. You do have the right to have representation now, not only at this time, but later on in the thing. That's just if you want an attorney, we're not going to talk to you right now. We are just going to put you in the bucket and shut things down." (Emphasis added.)

Here, even when appellant inquired once again concerning his right to appointed counsel, the question was ignored and the chief went through a dissertation of rights which appellant obviously did not under-stand. Shortly after this, appellant waived his rights after he was assured by the offi-cers that a waiver would not prejudice him.[2]

---

**2.** This clear misstatement was recited by the interrogating officer as follows: "*Okay, that—you don't, by signing this waiver, you don't waive your rights.*" (Emphasis added.) In my opinion, this statement alone must preclude any finding that appellant had knowingly and intelligently waived his rights. Thus, notwith-standing my conclusions that the police violat-ed appellant's rights by failing to cease ques-tioning after he had "asked" for a lawyer, I am

In my opinion, the facts outlined above lead to the conclusion that appellant asserted his right to counsel and only later waived that right at police insistence. This, according to my views, constituted a violation of the appellant's constitutional rights under the authorities discussed below.

As the majority opinion ably notes, the cornerstone authority for questions concerning the admissibility of confessions resulting from police interrogation is *Miranda v. Arizona,* supra. In that opinion the United States Supreme Court set out the procedures which the police are required to follow before an individual can be subject to custodial interrogation. In describing the holding of the case, Chief Justice Warren, writing for the court, stated:

"Our holding will be spelled out with some specificity in the pages which follow but briefly stated it is this: the prosecution may not use statements, whether exculpatory or inculpatory, stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination. By custodial interrogation, we mean questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way. As for the procedural safeguards to be employed, unless other fully effective means are devised to inform accused persons of their right of silence and to assure a continuous opportunity to exercise it, the following measures are required. Prior to any questioning, the person must be warned that he has a right to remain silent, that any statement he does make may be used as evidence against him, and that he has a right to the presence of an attorney, either retained or appointed. The defendant may waive effectuation of these rights, provided the waiver is made voluntarily, knowingly and intelligently. *If, however, he indicates in any manner and at any stage of the process that he wishes to consult with an attorney before speaking there can be no questioning.* Likewise, if the individual is alone and indicates in any manner that he does not wish to be interrogated, the police may not question him. The mere fact that he may have answered some questions or volunteered some statements on his own does not deprive him of the right to refrain from answering any further inquiries until he has consulted with an attorney and thereafter consents to be questioned." (Emphasis added.) 384 U.S. at 444–445, 86 S.Ct. at 1612.

Later in the opinion the Court further clarified the holding by stating:

"*If the individual indicates in any manner, at any time prior to or during questioning, that he wishes to remain silent, the interrogation must cease.* At this point he has shown that he intends to exercise his Fifth Amendment privilege; any statement taken after the person invokes his privilege cannot be other than the product of compulsion, subtle or otherwise. Without the right to cut off questioning, the setting of in-custody interrogation operates on the individual to overcome free choice in producing a statement after the privilege has been once invoked. If the individual states that he wants an attorney, the interrogation must cease until an attorney is present. At that time, the individual

also convinced that the State also failed to prove that he knowingly and intelligently waived that right. In *Edwards v. Arizona,* supra, 451 U.S. at 482, 101 S.Ct. at 1883, the Court stated the rule as follows:

"It is reasonably clear under our cases that waivers of counsel must not only be voluntary, but must also constitute a knowing and intelligent relinquishment or abandonment of a known right or privilege, a matter which depends in each case 'upon the particular facts and circumstances surrounding that case, including the background, experience, and conduct of the accused.' *Johnson v. Zerbst,* 304 U.S. 458, 464 [58 S.Ct. 1019, 1023, 82 L.Ed.2d 1461, 1466] (1938)."

See also: *U. S. v. Hinckley,* D.C.Cir., 672 F.2d 115. Given this rule, I cannot see how anyone can conclude that the appellant *knowingly and intelligently* relinquished any rights especially after being told by the police that by signing the waiver form he would not be waiving his rights.

must have an opportunity to confer with the attorney and to have him present during any subsequent questioning. If the individual cannot obtain an attorney and he indicates that he wants one before speaking to police, they must respect his decision to remain silent." (Emphasis added.) 384 U.S. at 473–474, 86 S.Ct. at 1627.

The Court also made it clear that in deciding the case they were only reiterating those rights guaranteed to an individual under the 5th and 6th Amendments to the United States Constitution.

We had an opportunity to discuss and apply the *Miranda* rationale to Art. 1, § 11 of the Wyoming Constitution in *Dryden v. State*, Wyo., 535 P.2d 483 (1975). In that case, the accused had twice informed interrogating officers of his desire to obtain counsel, which requests were ignored. Specifically, on the day of his arrest the suspect had informed the arresting officer that " 'I will get a lawyer when I get into town' " and on the following day he stated " 'I think I should have an attorney.' " Id. at 487–488. In response, we not only held that the challenged confessions should have been suppressed because appellant had received improper warnings, but we also held that, under *Miranda*, all interrogation should have ceased until counsel had been provided for appellant since he had effectively informed the officers that he desired a lawyer. In discussing this latter aspect of the case we said:

"Without engaging in the exercise in semantics indulged in by the county sheriff, we think it is established that at the earliest possible and appropriate time the defendant indicated his desire to have the assistance and advice of counsel. Instead of then proceeding to determine whether defendant was in a financial position to obtain such counsel or would require the appointment of an attorney, the county authorities ignored the statement and proceeded with continued interrogation that resulted in highly damaging admissions by the defendant. Having again been advised of defendant's desire for counsel on the 18th the sheriff chose to interpret the defendant's remarks as not being a request for counsel and did nothing except to inform the county attorney thereof. The county attorney likewise turned a deaf ear to the request and did nothing about it until after obtaining the information he wanted when he told defendant he thought he needed an attorney and would do something about it. It was only following this conversation, and even though defendant had been brought before a justice of the peace on another charge on the 19th, that the county attorney on the 23rd caused complaint and warrant for arrest to be filed and on the 24th brought the defendant before a justice of the peace as required by Rule 5(a), W.R.Cr.P.

"We hold that this failure to respond to repeated statements of the defendant that he desired counsel was a violation of defendant's constitutional rights as set forth in *Miranda*." 535 P.2d at 492.

In *Dryden*, we relied upon the previously quoted language from *Miranda*, supra, in determining that appellant's constitutional rights were violated since *Miranda* unequivocally required all questioning to cease once appellant asserted his right to counsel.

Not long after the *Miranda* opinion, the United States Supreme Court considered a case in which the petitioner challenged the admission of his confession because he believed, under *Miranda*, his rights had been violated. In *Frazier v. Cupp*, 394 U.S. 731, 89 S.Ct. 1420, 22 L.Ed.2d 684 (1969), the accused had stated during a portion of his interrogation that "I think I had better get a lawyer before I talk anymore." In rejecting his claim, the Court found that, since petitioner had been tried before the *Miranda* case had been decided, the holding of that case could not be applied retroactively so petitioner's claim was only considered in light of the decision in *Escobedo v. Illinois*, 378 U.S. 478, 84 S.Ct. 1758, 12 L.Ed.2d 977 (1964). However, in dicta, the Court noted that under *Miranda* their decision might have been different:

"Petitioner argues that his statement about getting a lawyer was sufficient to

bring *Escobedo* into play and that the police should immediately have stopped the questioning and obtained counsel for him. We might agree were *Miranda* applicable to this case, for in *Miranda* this court held that '[i]f . . . [a suspect] *indicates in any manner and at any stage of the process that he wishes to consult with an attorney before speaking there can be no questioning.*' 384 U.S., at 444–445 [86 S.Ct. at 1612]. But *Miranda* does not apply to this case." (Emphasis added.) 394 U.S. at 738, 89 S.Ct. at 1424.

In its 1975 decision in *Michigan v. Mosley*, 423 U.S. 96, 96 S.Ct. 321, 46 L.Ed.2d 313 (1975), the United States Supreme Court held that no violation of petitioner's constitutional rights occurred where petitioner had asserted his right to remain silent during an initial interrogation regarding some robberies and that wish had been honored, but he had later implicated himself in an unrelated murder after being questioned by a different police officer who had fully advised him of his rights a second time. It was important to the majority, in that case, that some four hours had elapsed between the first and second interviews, and also that the second questioning session involved a crime that was unrelated to the first. In distinguishing the case from other situations violative of *Miranda*, the Court stated:

"This is not a case, therefore, where the police failed to honor a decision of a person in custody to cut off questioning, either by refusing to discontinue the interrogation upon request or by persisting in repeated efforts to wear down his resistance and make him change his mind." 423 U.S. at 105–106, 96 S.Ct. at 327.

If *Michigan v. Mosley*, supra, caused any confusion as to what the police can do after a suspect invokes one of the rights recognized in *Miranda*, the United States Supreme Court recently removed any doubts, in *Edwards v. Arizona*, supra. There the justices were faced with a challenge to the admissibility of statements made by the petitioner after he had first invoked his right to counsel [3] and had then, after insis-

tence by several officers, implicated himself in the same crime concerning which he had previously refused to discuss. After the first assertion of his desire for counsel, petitioner had been placed in a cell. Later, several detectives had come and requested to interview Edwards. Edwards told the guard he did not desire to speak but the guard responded that he had to. At that point petitioner was taken to the room where the detectives were waiting and, after being read his *Miranda* rights, he gave an inculpatory statement. The Court reversed the conviction on the grounds that petitioner's constitutional right to silence was violated by the second interrogation and all statements derived therefrom should have been suppressed. In so holding, the Court stated:

"Second, although we have held that after initially being advised of his *Miranda* rights, the accused may himself validly waive his rights and respond to interrogation, see *North Carolina v. Butler*, supra, [441 U.S. 369] at 372–376 [99 S.Ct. 1755, at 1756–59, 60 L.Ed.2d 286], the Court has strongly indicated that additional safeguards are necessary when the accused asks for counsel; and *we now hold that when an accused has invoked his right to have counsel present during custodial interrogation, a valid waiver of that right cannot be established by showing only that he responded to further police-initiated custodial interrogation even if he has been advised of his rights. We further hold that an accused, such as Edwards, having expressed his desire to deal with the police only through counsel, is not subject to further interrogation by the authorities until counsel has been made available to him, unless the accused himself initiates further communication, exchanges, or conversations with the police.*

"*Miranda* itself indicated that the assertion of the right to counsel was a significant event and that once exercised by the accused, 'the interrogation must cease until an attorney is present.' 384 U.S., at 474 [86 S.Ct. at 1627]. Our later

---

**3.** Petitioner had stated during initial interview:

"I want an attorney before making a deal."

cases have not abandoned that view. In *Michigan v. Mosley*, 423 U.S. 96 [96 S.Ct. 321, 46 L.Ed.2d 313] (1975), the Court noted that *Miranda* had distinguished between the procedural safeguards triggered by a request to remain silent and a request for an attorney and had required that interrogation cease until an attorney was present only if the individual stated that he wanted counsel. 423 U.S., at 104, n. 10 [96 S.Ct., at 326, n. 10]; see also id., at 109–111 [96 S.Ct., at 329–330] (White, J., concurring). *In Fare v. Michael C., supra* [442 U.S. 707] at 719 [99 S.Ct. 2560, at 2568, 61 L.Ed.2d 197], *the Court referred to Miranda's 'rigid rule that an accused's request for an attorney is per se an invocation of his Fifth Amendment rights, requiring that all interrogation cease.'* And just last Term, in a case where a suspect in custody had invoked his *Miranda* right to counsel, the Court again referred to the 'undisputed right' under *Miranda* to remain silent and to be free of interrogation 'until he had consulted with a lawyer.' *Rhode Island v. Innis*, 446 U.S. 291, 298 [100 S.Ct. 1682, 1688, 64 L.Ed.2d 297] (1980). We reconfirm these views and, to lend them substance, emphasize that it is inconsistent with *Miranda* and its progeny for the authorities, at their instance, to reinterrogate an accused in custody if he has clearly asserted his right to counsel." (Emphasis added.) 451 U.S. at 484–485, 101 S.Ct. at 1884.

The import of the holding in *Edwards* is that once an accused has invoked his right to counsel, the police are required to cease all efforts at interrogation, and any further discussion between the two can only occur when counsel is provided or when the accused himself is the initiator of further conversation.

Thus, for me, the only question presented in this case concerns whether or not the appellant did in fact and in law actually assert his right to have counsel present during the initial conversation with the Chief of Police. If he did, it is clear from the above authorities that his statement was taken in violation of his constitutional right to silence because at the time the right to counsel was invoked, the officers did not cease the interrogation nor was any further conversation initiated by appellant himself. If such is the case, the question of a knowing, intelligent, and voluntary waiver never arises. As the following discussion will show, I can only conclude that, in and under the circumstances then and there existing in the offices of the Chief of Police, appellant's statement that he "would probably like to have an attorney present," was sufficient to inform the police of his desire to have an attorney and that all questioning should have stopped. The failure of the police to cease interrogation required the district court to suppress appellant's later statement. It was error not to do so.

Of course, the question of whether appellant actually invoked his right to counsel depends on an interpretation of the previously quoted language from *Miranda v. Arizona, supra*:

"If, however, he indicates *in any manner and at any stage of the process* that he wishes to consult with an attorney before speaking there can be no questioning." (Emphasis added.) 384 U.S. at 444–445, 86 S.Ct. at 1612.

This question is one that has been dealt with comprehensively by other courts.

For example, in *People v. Harris*, 191 Colo. 234, 552 P.2d 10 (1976) the accused inquired, "When can I get a lawyer?" and the police responded that he could get one on Monday since it was a Saturday when the defendant was being questioned. In holding that the subsequent statement made by appellant was taken in violation of his *Miranda* rights, the Supreme Court of Colorado stated:

"The defendant made a request for an attorney, and the police officers were thereby placed on notice that the defendant intended to exercise his constitutional rights. Admittedly, the demand was not in the most sophisticated or legally proper form, but it was adequate. At that point, all interrogation should have ceased until an attorney was made available to the

accused. The fact that the accused did not 'demand' an attorney does not persuade us that he was not exercising his rights." 552 P.2d at 12.

Likewise, in *State v. Nicholson,* 19 Or.App. 226, 527 P.2d 140 (1974), the court cited with approval earlier case law [4] holding that when accused says, " 'Maybe I should see an attorney, or I should talk with an attorney,' " this is a sufficient express request invoking the right to have counsel present before questioning. In that opinion, the court further stated that *Miranda* does not allow inquiry into the accused's reason for requesting counsel but rather clearly mandates that questioning stop until an attorney is present. Id. 527 P.2d at 142. Finally, the court noted:

> "The defendant is not required to make repeated requests for counsel; one is sufficient." 527 P.2d at 143.

Similarly, in *People v. Ireland,* 70 Cal.2d 522, 75 Cal.Rptr. 188, 40 A.L.R.3d 1323, 450 P.2d 580 (1969), the California Supreme Court asserted that even where an accused makes an indirect indication that he desires the presence of counsel, such a statement requires an immediate cessation of any questioning.[5] For similar statements of the rule see: *Giacomazzi v. State,* Alaska, 633 P.2d 218, 221 (1981) (no particular form of words are necessary for an accused to invoke his right to counsel); *U. S. v. Prestigiacomo,* 504 F.Supp. 681, 683 (1981) (statement " 'maybe it would be good to have a lawyer' " was sufficient to invoke right to counsel); *People v. Stroh,* 48 N.Y.2d 1000, 425 N.Y.S.2d 548, 401 N.E.2d 906 (1980) (statement that accused wanted to talk to "a priest or an attorney" was sufficient to invoke right to counsel); *State v. Nash,* 119 N.H. 728, 407 A.2d 365 (1979) (statement by accused " 'he thought he had better talk to an attorney' " was sufficient to invoke right

to counsel); *People v. Lewis,* 47 Mich.App. 450, 209 N.W.2d 450 (1973) (inquiry by accused as to possibility of getting an attorney was sufficient to invoke right).[6]

The above-quoted cases clearly stand for the proposition that it is not necessary for an accused to state outright, "I want an attorney," in order for the right to have counsel present to be invoked. Rather, they stand for the well-considered rule that where an accused gives the police any indication, "in any manner," that he desires an attorney all questioning or inquiry on their part must be terminated, and, under *Edwards v. Arizona,* supra, questioning cannot resume until counsel is provided or the accused himself instigates further contact.

Applying the rule I have just discussed to the facts of this case, I can reach but one conclusion, which is that appellant did in fact and law invoke his right to counsel when he stated he would "probably want to have counsel present." At this point it was incumbent upon the police to cease all contact with appellant until he was provided a lawyer. Since they did not cease contact but, instead, undertook to convince Daniel that he did not need a lawyer and that a waiver would not prejudice his rights, the statement subsequently obtained was procured in violation of Daniel's constitutional rights. Therefore, the trial court erred in failing to suppress that statement.

As I have indicated above, I am nevertheless convinced that the admission of appellant's statement did not prejudice him or affect the outcome of his trial since the jury convicted Mr. Daniel of the crime to which he had originally confessed—that being causing the accidental death of Helen Bunning. The statement was merely a more detailed version of his confession which was consistent with his previous story that the victim's death occurred by accident. The

---

4. See: *State v. Ayers,* 16 Or.App. 300, 518 P.2d 190 (1974).

5. In *People v. Enriquez,* 19 Cal.3d 221, 137 Cal.Rptr. 171, 561 P.2d 261, 262 (1977) the court cited the *Ireland* case and reiterated that, under it and the rules of *Miranda,* not only must questioning cease but also the police can-

not make further attempts to extract a waiver once the right to counsel is invoked.

6. For similar statements confirming the rule see: *White v. Finkbeiner,* 611 F.2d 186 (7th Cir. 1979); *Maglio v. Jago,* 580 F.2d 202 (6th Cir. 1978); *U. S. v. Clark,* 499 F.2d 802 (4th Cir. 1974).

added details did nothing to affect the outcome of his trial. *People v. Jacobson*, 63 Cal.2d 319, 46 Cal.Rptr. 515, 405 P.2d 555 (1965). For this reason alone I concur in the result reached by the majority.

## THE SENTENCING ASPECT

Likewise, I concur in the result reached by the majority with respect to the sentencing aspect of appellant's case, but, in the same breath, reiterate the position I expressed in *Scheikofsky v. State*, supra, with regard to the need for this court to develop standards against which trial-court sentencing may be tested.

In *Scheikofsky*, I urged the adoption of appropriate sentence-review standards that would be compatible with the sentencing purposes expressed in Art. 1, § 15 of the Wyoming Constitution. By way of reiteration, this constitutional provision says:

> "The penal code shall be framed on the humane principles of reformation and prevention."

Under this mandate, I said in *Scheikofsky*, and I am of the opinion still, that our past history of refusing to review a sentence falling within statutory parameters is not in the best interests of the citizenry of Wyoming.

Today's trend in the law encourages appellate courts to take a more enlightened stance with regard to the sentencing of criminal offenders. Conceding that sentencing authority lies within the discretion of a trial court, this important aspect in the judicial process should not thereby be placed beyond the pale of appellate scrutiny. *State v. Messer*, Iowa, 306 N.W.2d 731 (1981); *State v. Jones*, La., 398 So.2d 1049 (1981); *People v. Watkins*, Colo., 613 P.2d 633 (1980); *State v. Dillon*, 100 Idaho 723, 604 P.2d 737 (1979). Sentencing inquiry and review should be guided by the reasonable standards adopted in *State v. Chaney*, Alaska, 477 P.2d 441, 443–44 (1970), which standards I set out in my concurring opinion in *Scheikofsky v. State*, supra.

I feel compelled to italicize my position on this subject because, in the case at bar, the appellant's sentence for his conviction of negligent homicide is severe indeed. Even the State in its brief admits that the 19-year-minimum sentence imposed by the trial judge is some 12 years longer than any minimum sentence imposed for involuntary manslaughter in any recent case in Wyoming. I agree with the majority that we cannot and should not demand uniformity, but it is also true that the purpose of criminal sentencing in this state is to aid in the defendant's rehabilitation and to help society in attaining its goal of crime prevention and deterrence. I wonder whether the sentence imposed in this case is specifically calculated to accomplish these purposes. Until my brothers on the court join me in a meaningful inquiry into the concepts that I have expressed, appellate sentencing standards will not be adopted. In the meantime, I must concur in the majority opinion since under our past authority the sentence in this case clearly falls within the statutory parameters set by the legislature—and this is the only standard that this court now recognizes.

Until the time when we develop meaningful standards against which to test the exercise of sentencing discretion, I will be forced to remain in the position of having to concur in opinions where the court holds that discretion has not been abused as long as sentencing falls within statutory parameters.

I therefore concur—but reluctantly.