Scott Lee DUFFY, Appellant
(Defendant),

v.

The STATE of Wyoming,
Appellee (Plaintiff).

No. 86–21.

Supreme Court of Wyoming.

Dec. 5, 1986.

Leonard Munker, State Public Defender, Gerald M. Gallivan, Director, Wyoming Defender Aid Program, Laramie, K. Leslie Delk (argued), Appellate Counsel, Cheyenne, and Margaret Maurer, Legal Intern, Laramie, for appellant (defendant).

A.G. McClintock, Atty. Gen., Gerald A. Stack, Deputy Atty. Gen., John W. Renneisen, Sr. Asst. Atty. Gen. (argued), and Kevin Saxby, Student Intern (argued), Cheyenne, for appellee (plaintiff).

Before THOMAS, C.J., and BROWN, CARDINE, URBIGKIT and MACY, JJ.

CARDINE, Justice.

After pleading guilty to a two-count information charging him with aiding and abetting an aggravated robbery and conspiring to commit burglary, appellant Scott Duffy was sentenced by the district court to two consecutive terms in the Wyoming State Penitentiary. His sentence on the aggravated robbery count was for not less than 24 years, 11 months, and 29 days and not more than 25 years. The minimum term for the conspiracy count was not less than 9 years, 11 months, and 29 days; the maximum was 10 years. Appellant was to begin serving his first Wyoming sentence as soon as he completed a Colorado sentence which he was serving when he committed the Wyoming crimes.

Appellant maintains that the district court violated Wyoming's indeterminate sentencing statute when it separated the maximum and minimum sentences by only a single day and when it failed to give him credit for the time he spent in the Fremont county jail awaiting trial. He also contends that the court abused its discretion by basing its sentencing decision on ill will toward defense counsel. Finally, in an issue raised for the first time at oral argument, appellant argues that the consecutive sentences were illegal because the two crimes merged.

## FACTS

The following facts were presented by the prosecutor at the sentencing hearing, and appellant conceded their accuracy. At about 2:30 a.m. on July 4, 1984, appellant's grandmother, Ada Johnson, was awakened by the sound of breaking glass at her home in Lander. She went to the front door where she was confronted by Richard Sweaney who forced her to open the door at gunpoint. Sweaney made her take him to various parts of the house where valuables were stored. In an empty pillowcase he collected a diamond wrist watch and other jewelry, a .38 caliber handgun, and her purse. He then forced her out of the house, walked her to the edge of her property, and fled to a waiting car driven by one of his accomplices, Michele Frey.

Appellant, Sweaney, and Frey planned the crime over the telephone while appellant was serving time for a Colorado burglary conviction in a halfway house in Castle Rock, Colorado. Appellant told Sweaney how to enter the house and where to look for the valuables. He also encouraged Sweaney to take a firearm. After the burglary, Sweaney and Frey were to travel to Colorado and help appellant flee the state.

The police foiled the plan by apprehending Frey and Sweaney soon after the crime. Based on their confessions, a criminal complaint was filed in Fremont County on July 6, 1984, charging appellant with one count of aiding and abetting aggravated robbery under § 6-1-201(a), (b)(i), W.S.1977 (June 1983 replacement) and one count of conspir-

acy to commit burglary under § 6–1–303, W.S.1977 (June 1983 replacement). The prosecutor filed a detainer on April 29, 1985; and, in early June, the Colorado authorities allowed appellant's removal to the Fremont County jail.

Appellant initially pled not guilty, and the case was set for trial in December. He changed his plea to guilty, however, at a hearing held on November 14, 1985. At that hearing he waived his right to a presentence investigation; and, after the prosecutor and defense counsel presented the relevant facts, the district court sentenced him to the consecutive terms outlined above. The court explained its sentencing rationale with the following statement:

"I want you to know that I have considered all of the factors to be considered in the American Bar Association Standards of Criminal Justice with reference to sentencing. They're incorporated in this proceeding by reference, each and every one of them. I specifically find there are no mitigating factors applicable to this Defendant. I find the offender the leader of the criminal enterprise; the victim was particularly vulnerable. The victim was treated with cruelty for which this Defendant should be held responsible. The offense involved threatened violence. The Defendant is in need of correctional treatment that can best be provided by the sentence to be imposed. He deserves to be punished given the serious nature of the offense. There's an undue risk if a lesser sentence were imposed, the offender would continue to commit criminal offenses, it being noted this is his sixth and seventh felony. [Appellant, age 22, had five prior felony convictions for burglary, auto theft, auto burglary and second degree forgery.] The Defendant should be punished to deter others from committing crime. He continues to commit crimes even though less restrictive sanctions have been applied. And the isolation of this offender is necessary for the protection of the public among other things."

After the judgment was entered, appellant was returned to Colorado to finish his prior sentence. His stay in the Fremont County jail was credited against his Colorado term.

## INDETERMINATE SENTENCING

■ Appellant contends that the district court violated § 7–13–201, W.S.1977, which states:

"When a convict is sentenced to the state penitentiary, otherwise than for life, for an offense or crime, the court imposing the sentence shall not fix a definite term of imprisonment, but shall establish a maximum and minimum term for which said convict shall be held in said prison. The maximum term shall not be longer than the longest term fixed by law for the punishment of the offense of which he was convicted, and the minimum term shall not be less than the shortest term fixed by law for the punishment of the offense of which he was convicted."

According to appellant, the trial court essentially imposed determinate sentences on both counts because there was only a single day between the minimum and maximum sentences. But there is nothing in the statute which requires any fixed period of time between the minimum and maximum, and this court would be interfering with an important legislative function if it undertook to establish such a period. We doubt that the legislature overlooked the obvious possibility that a judge might impose the sentences imposed here. Justice Brown, in a concurring opinion in *Jahnke v. State*, Wyo., 682 P.2d 991, 1010–1011 (1984), noted that such sentences would be possible under the statute. He stated that the judge in that case "could have sentenced Richard [Jahnke] to not less than nineteen years, eleven months and twenty-nine days." The legislature has not amended the statute in response to Justice Brown's observation.

The primary responsibility for criminal sentencing rests with the legislature which has the resources and mandate to create an effective corrections policy. Unless and until the legislature changes § 7–13–201, W.S.1977, sentences like those imposed in

this case will be considered indeterminate and legal.

## TIME SERVED

█ The district court did not give appellant credit for the time he spent in the Fremont County jail awaiting trial. According to appellant, this decision by the court violates the rule stated in *Jones v. State*, Wyo., 602 P.2d 378, 381 (1979):

> "[A] trial judge has discretion to deny or grant credit for time served in pre-sentence custody where: (1) the pre-sentence custody is not due to the defendant's indigency, and (2) *the sum of the time spent in pre-sentence custody plus the sentence does not exceed the maximum allowable sentence.*" (Emphasis added.)

The problem with this argument is that appellant was not being held in the Fremont County jail solely on the Wyoming charges. He was serving his Colorado sentence and could not have been released on bond by the district court. The Interstate Agreement on Detainers provides:

> "(d) The temporary custody referred to in this agreement shall be only for the purpose of permitting prosecution on the charge or charges contained in one (1) or more untried indictments, informations or complaints which form the basis of the detainer or detainers or for prosecution on any other charge or charges arising out of the same transaction. Except for his attendance at court and while being transported to or from any place at which his presence may be required, the prisoner shall be held in a suitable jail or other facility regularly used for persons awaiting prosecution.
>
> "(e) At the earliest practicable time consonant with the purpose of this agreement, the prisoner shall be returned to the sending state.
>
> "(f) During the continuance of temporary custody or while the prisoner is otherwise being made available for trial as required by this agreement, *time being served on the sentence shall continue to run* but good time shall be earned

by the prisoner only if, and to the extent that, the law and practice of the jurisdiction which imposed the sentence may allow.

> (g) *For all purposes other than that for which temporary custody as provided in this agreement is exercised, the prisoner shall be deemed to remain in the custody of and subject to the jurisdiction of the sending state* and any escape from temporary custody may be dealt with in the same manner as an escape from the original place of imprisonment or in any other manner permitted by law." (Emphasis added.) Section 7–15–101, Art. V, W.S.1977.

If we were to hold as appellant suggests, he would receive credit against both his Colorado and Wyoming sentences for the time spent awaiting trial in Wyoming. He would receive a special benefit because he happened to commit the Wyoming crime while still incarcerated for a prior Colorado offense. Clearly, the Interstate Agreement on Detainers is not intended to reward a criminal for committing his crimes from prison. The district court properly held that appellant was not entitled to credit against his Wyoming sentences for the time spent in the Fremont County jail.

## ABUSE OF DISCRETION

█ In *Martin v. State*, Wyo., 720 P.2d 894 (1986), we clarified the meaning of the term "abuse of discretion." We explained that a court can abuse its discretion even if it does not commit an error of law; therefore, the frequently cited statement in *Martinez v. State*, Wyo., 611 P.2d 831, 838 (1980), that

> "[a]n abuse of discretion has been said to mean an error of law committed by the court under the circumstances"

is seriously misleading. When the misleading sentence is stricken from the *Martinez* definition, the traditional test re-emerges.

> " 'A court does not abuse its discretion unless it acts in a manner which exceeds the bounds of reason under the circumstances. In determining whether there has been an abuse of discretion, the ulti-

mate issue is whether or not the court could reasonably conclude as it did.' " See *Martin v. State,* supra, 720 P.2d at 896 (quoting from *Martinez v. State,* supra, 611 P.2d at 838).

■ The sentences imposed in this case were well within the bounds of reason under the circumstances. Appellant had committed five prior felonies and was serving time for his most recent crime when he planned the armed robbery of his grandmother. Apparently his prior prison stays had no rehabilitative effect, and the district court correctly concluded that he represented a continuing threat to others. The aggravated robbery and burglary which he planned were serious crimes that involved threatened violence to a particularly vulnerable victim. There were no mitigating factors.

Appellant contends that the district court imposed severe sentences in order to punish the public defender's office. But the statements he quotes from the record to support his argument indicate nothing of the kind. It is perfectly clear why appellant received the most severe sentences that could have been legally imposed—he earned them. There was no abuse of discretion.

## MERGER

■ At oral argument before this court, appellant contended that he should have been sentenced under only one of the charges because of the doctrine of merger. This issue was not raised in the district court or mentioned in appellant's brief to this court.

"Except for appeals which involve issues of jurisdiction or fundamental rights, we will not ordinarily consider contentions of error unless the trial court has first been apprised thereof and given an opportunity to rule upon the alleged error." *Dennis v. Dennis,* Wyo., 675 P.2d 265, 266 (1984).

"[U]nder the settled authority of this court we will not consider [those] points which have not been briefed * * *." *Za-*

*netti v. Zanetti,* Wyo., 689 P.2d 1116, 1123 (1984).

"We are, however, under an independent duty to examine whether this court's jurisdiction has been properly invoked, even where the parties have not raised the jurisdictional issue." *Kurpjuweit v. Northwestern Development Company, Inc.,* Wyo., 708 P.2d 39, 44 (1985).

Although appellant failed to preserve the issue in either the district court or this court, we could theoretically conduct our own investigation to determine whether the district court had jurisdiction to sentence appellant under both counts.

"[I]f the appellate court notices that the sentence is illegal it can, on appeal from the conviction, order the trial court to reduce the sentence to the maximum that would be valid." See 3 Wright, Federal Practice and Procedure: Criminal 2d § 588, at 415 (1982).

In this case, however, we are not confronted with an obviously illegal sentence which we can simply correct. Appellant's merger argument is complex and would have to be researched extensively. This is exactly the kind of issue that defense counsel should bring to the attention of the trial court and the State at the proper times so that it can be thoroughly explored and argued and fairly adjudicated. Instead of conducting our own investigation of the merger issue, we will invoke the

"general rule that a motion for correction [of sentence] under Rule 36 [W.R. Cr.P.] should be made to the sentencing court in the first instance." *Price v. State,* Wyo., 716 P.2d 324, 328 (1986).

If appellant makes a proper motion to correct this claimed illegal sentence under Rule 36, W.R.Cr.P., and if the motion is denied, then the issue might more properly be brought before this court on appeal.

## JUDICIAL INTERVENTION

■ We do not dispute the proposition that a sentence which gives the *same* minimum and maximum sentences (i.e., three years to three years) is in fact a determinate sentence and illegal under an indeter-

minate sentencing scheme. The decided cases generally stand for this proposition. Just two states—New Mexico and Tennessee—have held that a sentence with the identical minimum and maximum terms is indeterminate. The New Mexico legislature has since adopted a determinate sentencing structure; the Tennessee legislature has since adopted legislation specifying the required range between the minimum and maximum sentences. The question we confront here is whether a difference of one day, which technically satisfies the statutory requirement of minimum and maximum sentences, so violates the spirit of the indeterminate sentencing scheme that this court should act in the face of legislative silence concerning a mandatory spread between minimum and maximum sentences. We do learn from New Mexico and Tennessee in that we will leave this matter to the legislature as was done in those states. We do not say a day is the same as one year, two years, or five years. There are different ranges between sentences, and we say only that where the maximum sentence is greater than the minimum, it is technically an indeterminate sentence. We will discuss the cases cited by the dissent which are said to be authority for judicially creating the spread between minimum and maximum sentences.

In several states, appellate courts are given specific authority to reduce sentences on appeal. Wyoming statutes contain no such grant of authority. The Illinois Supreme Court, under such authority, has held that a sentence, while complying with the letter of the indeterminate sentencing legislation, might so violate its spirit as to justify a different sentence, but continuing implied that, with appropriate justification from the sentencing judge, a sentence whose minimum and maximum terms are separated by one day might be upheld. *People v. Harper*, 50 Ill.2d 296, 278 N.E.2d 771, 774 (1972).

In *People v. Scott*, 117 Ill.App.2d 344, 253 N.E.2d 553 (1969), the appellant sought reduction of an excessive sentence, 7–14 years for armed robbery. At that time, as when Harper, supra, was decided, *a statute which specifically authorized reduction of sentences* by the reviewing court was in effect. Under such authority, and because the appellant had no "prior criminal propensities," the court reduced the minimum sentence to five years.

In *People v. Pacheco*, 41 Colo.App. 188, 581 P.2d 741 (1978), the defendant appealed his sentence of 34–38 years for assault in the first degree as being excessive. *A statute authorized appellate review of sentences*. The court, after alluding to the fact that this was a maximum sentence, held the sentence justified under the circumstances and affirmed.

Courts have tinkered with sentences to make them comply with indeterminate sentencing statutes. Thus, after upsetting defendant's sentence of death, the court discussed the judicial power to punish for not less than 20 years. The court explained that where only a minimum term is specified by statute, the court must set a maximum, up to life, to allow the possibility of parole and ordered a sentence of 20 years to life, the full statutory range. *Spillers v. State*, 84 Nev. 23, 436 P.2d 18, 22–23 (1968), overruled on other grounds, *Bean v. State*, 86 Nev. 80, 465 P.2d 133 (1970). There was no discussion concerning a minimum spread that would allow for the possibility of parole.

In *Ard v. State ex rel. Superior Court of Pima County*, 102 Ariz. 221, 427 P.2d 913 (1967), the trial court, under a statute providing for a 10 year sentence, imposed a life sentence. The Arizona Supreme Court set aside the determinate life sentence as violative of the indeterminate sentencing statute. Where a statute specifies only a minimum term, the court may not impose a maximum determinate sentence. Id., 427 P.2d at 916.

In *In re Shequin*, 131 Vt. 111, 300 A.2d 536 (1973), the court found a sentence of 35–40 years for second degree murder not to violate the spirit and intent of the indeterminate sentencing statute. In *Woodmansee v. Stoneman*, 133 Vt. 449, 344 A.2d 26, 33 (1975), the court likewise ap-

proved a sentence of 6–7 years. And *In re Parent*, 125 Vt. 475, 218 A.2d 717 (1965), held improper a sentence with identical minimum and maximum terms.

Just one court, Michigan, has, without statutory authority, created the range to be imposed between the minimum and maximum terms. The Michigan court first refused to hold sentences whose minimum and maximum terms were separated by one day to be determinate sentences. *People v. Lessard*, 22 Mich.App. 342, 177 N.W.2d 208 (1970). Later the court reversed itself and overturned sentences with 30 days between the minimum and maximum, observing that although this was technically an indeterminate sentence, it failed "to comply with the clear intent and purpose of the indeterminate sentence act," and held "that any sentence which provides for a minimum exceeding two-thirds of the maximum is improper as failing to comply with the indeterminate sentence act." *People v. Tanner*, 387 Mich. 683, 199 N.W.2d 202, 204–205 (1972). Under this judicially promulgated law governing sentences, the court of appeals reduced a 35–50 year sentence to 33½–50 years, *People v. Duffy*, 67 Mich. App. 266, 240 N.W.2d 771, 773 (1976), and a 23–24 month sentence to 16–24 months, *People v. Redwine*, 73 Mich.App. 83, 250 N.W.2d 550, 551 (1976). Sentences to be imposed for violation of numerous criminal statutes is a matter ordinarily better left to the legislature. This court, therefore, declines the invitation to engage in judicial legislation by adopting an appropriate spread between minimum and maximum sentences. We perceive that if a spread between minimum and maximum sentences is appropriate, that is a simple matter for the legislature to provide.

## LEGISLATIVE INTENT

■ The recital of legislative history is impressive, but it underscores the wisdom of the rule stated in *Independent Producers Marketing Corporation v. Cobb*, Wyo., 721 P.2d 1106, 1108 (1986), that affidavits by "persons involved in the enactment of a statute are not a proper source of legislative history." Among other factors, we must consider the impact of *Daniel v. State*, Wyo., 644 P.2d 172 (1982), and similar cases concerning sentencing. In *Daniel v. State*, this court upheld a sentence of 19–20 years imprisonment on a conviction of involuntary manslaughter, where 20 years was the maximum allowed. We noted in *Daniel* that the trial judge is given wide discretion in sentencing. Id., quoting *Jones v. State*, Wyo., 602 P.2d 378, 380 (1979). We said:

> "Wyoming has a system of indeterminate sentencing, which carries with it an implicit adoption of the philosophy of individual sentencing. This system of indeterminate sentencing necessitates the granting of broad discretion to the trial judge, who must choose from the sentencing alternatives and the range of permissible penalties." (Footnote omitted.) 644 P.2d at 178.

We rejected the notion that uniformity in sentencing is required because crimes and criminals vary:

> "The circumstances of each crime are different. The background of each convicted person is different and his rehabilitative needs are different. Also, the potential of each convict to be a productive member of society is different." Id., 644 P.2d at 180.

Under the version of § 7–13–402(a), W.S. 1977, then in effect, Daniel would not have been eligible for parole for 19 years. The perceived injustice of the sentence was heightened by the fact that had Daniel been convicted of first degree murder with which he was originally charged (644 P.2d at 173, n. 1) and sentenced to life, he would, in all likelihood, have been released well before 19 years.

In responding to the perceived inequities of discretionary indeterminate sentencing, the legislature did not impose determinate sentencing nor even specify a mandatory period between minimum and maximum sentences. Rather, less than two years after *Daniel* was decided, the legislature made only two changes: § 7–13–402(a) was amended to provide that inmates were eligi-

ble for parole after serving the minimum sentence less good time. Section 7–13–423 was added, authorizing rules for good time to be deducted from either the maximum or minimum sentence or both. The rules provide for up to 15 days per month, after the first six months, good time off the minimum sentence. In all events, good time is a matter of grace and not of right.

Thus, although the legislature perceived the potential difficulties of combining indeterminate sentencing and judicial discretion, it chose only these less restrictive means to remedy the situation. Emphatically it did not mandate a spread of years or days between the minimum and maximum sentences. Someday it may choose to do so. Until then this court must apply the sentencing statutes as they are written.

Affirmed.

THOMAS, C.J., concurs in result only.

URBIGKIT and MACY, JJ., each filed separate dissenting opinions.

URBIGKIT, Justice, dissenting.

Honest and deep-seated philosophic conflict with the conclusions of my brethren involving the intrinsic status of democratic government and separation of powers, defined by Art. 2 of the Wyoming Constitution, causes me to dissent most forcefully.

The decision in this case is constitutionally far broader than the simple fact of the long-term penitentiary confinement for Scott Duffy resulting from his telephone calls from a confinement facility in Castle Rock, Colorado.

First, this court creates determinate sentencing in direct contravention of the Wyoming indeterminate sentencing statutes, ignoring legislative intent and executive branch function.

Secondly, the issue of sentence illegality is disregarded by the majority's reliance on such post-sentence relief procedures as may later be utilized by the defendant.

Finally, the double-jeopardy prohibitions of Art. 1, § 11 of the Wyoming Constitution and the Fifth Amendment of the United States Constitution discernible from the record are disregarded if the telephone calls made by defendant do not justify sentences for the same act.

Recognizing that the court, by its approach on the second issue, has relegated consideration of the third issue to a succeeding appeal to this court and subsequent resort to the federal judiciary, my discussion of these issues will not be extended except as to the philosophic concern about a delayed answer to the contended duplicitous sentencing. This dissent will focus on the determinate sentences which Scott Duffy received.

### Indeterminate Sentencing Under Wyoming Statutes—History

Historically, the existing indeterminate sentencing system of Ch. 84, S.L. of Wyoming 1909, replaced the determinate sentencing standard of Ch. 14, S.L. of Wyoming 1876.

The approach of the legislature is reflected in the terminology utilized in §§ 2 and 3 of the act. Intent is clear that any judicial effort to avoid the statute would result in a minimum term of one year, or a greater term only if a longer statutory minimum sentence time was expressly provided by law.

"Sec. 2 If through oversight or otherwise any person be sentenced to imprisonment in the State Penitentiary for a definite period of time other than for life, said sentence shall not for that reason be void, but the prisoner so sentenced shall be entitled to the benefit and subject to the liabilities of this act, in the same manner and to the same extent as if the sentence had been in the terms required in Section 1 of this act.

"Sec. 3 The Governor of the State of Wyoming shall have authority under such rules and regulations as may be prescribed by the State Board of Pardons to issue a parole or permit to go at large to any convict who now is, or hereafter may be, imprisoned in the State Penitentiary under a sentence other than a life sentence, who may have served the mini-

mum term pronounced by the trial court, *or in the absence of such minimum term pronounced by the court,* the minimum term provided by law for the crime for which he was convicted * * *." (Emphasis added.) Chapter 84, S.L. of Wyoming 1909.

The first significant change in the law then occurred in Ch. 20, S.L. of Wyoming 1947, and did not change the 1909 indeterminate-sentencing standard, retained in identical language to the present in § 7–13–201, W.S.1977.

Wyoming law on sentencing was most significantly changed by the Wyoming legislature in 1984 by Ch. 49, S.L. of Wyoming 1984, although certainly not done in response to *Jahnke v. State,* Wyo., 682 P.2d 991 (1984).

Conversely, a cryptic comment in the Jahnke opinion concurrence that the trial court could have sentenced to not less than 20 years maximum would hardly have been warning to the members of the legislature that this court was going to abandon existing statutes,[1] and, by court legislation, would then adopt a determinative sentencing alternative contrary to both the historical perspective of the Wyoming statute and the clear expression of legislative intent.[2]

Wyoming law on this point consequently continued unaltered since its adoption in 1909, until the facts of the Duffy case obviously aggravated the trial judge at sentencing time, causing him to pursue circumvention of the Wyoming statutes to avoid application of the parole or good-time allowance provisions of those laws.

As a result of telephone calls from a Colorado penal institution, Duffy received (a) no credit for confinement awaiting trial and sentencing because of his continued serving of a prior sentence for a Colorado offense; (b) no credit for the further Colorado sentence time required; (c) 24 years, 11 months, 29 days to 25 years (25–year maximum on the offense) and 9 years, 11 months, 29 days to 10 years (10–year maximum on a second offense upon guilty pleas to be served consecutively). This sentence may be fair or unfair, but it is a system of laws that is at issue.

Neither Wyoming constitutional provisions, including Art. 1, § 15 of the Wyoming Constitution:

"The penal code shall be framed on the humane principles of reformation and prevention,"

1. See House Bill 25, 1983 Digest of House Journal; House Bill 159, 1984, House Enrolled Act No. 25, Ch. 45, S.L. of Wyoming 1984, as passed on final vote in the Senate, 30 to 0 and by the House 52 to 11 with one excused. See also Minutes of Joint Judiciary Interim Committee, Sentencing Study, June 15, 1983, October 21, 1983, May 31, 1984, and August 15 and 16, 1984. See also Select Correction Oversight Committee and Joint Judiciary Interim Committee Minutes, October 22, 1983.

2. The heavy majorities for passage of the good-time bill in 1984, including a unanimous Senate vote after defeat by that body in the prior session as an issue hotly debated and heavily contested by some members of the judiciary, is clear demonstration of legislative intent. Furthermore:

"* * * Various considerations of parliamentary tactics and strategy might be suggested as reasons for the inaction of the Treasury and of Congress, but they would only be sufficient to indicate that we walk on quicksand when we try to find in the absence of corrective legislation a controlling legal principle." *Helvering v. Hallock,* 309 U.S. 106, 121, 60 S.Ct.

444, [452], 84 L.Ed. 604, 125 A.L.R. 1368 (1940).

"* * * [T]he idea cannot always be accepted that Congress, by remaining silent and taking no affirmative action in repudiation, gives approval to judicial misconstruction of its enactments. * * *

"* * * And there are many reasons, other than to indicate approval of what the courts have done, why Congress may fail to take affirmative action to repudiate their misconstruction of its duly adopted laws. Among them may be the sheer pressure of other and more important business. * * * At times political considerations may work to forbid taking corrective action. And in such cases, as well as others, there may be a strong and proper tendency to trust to the courts to correct their own errors * * *, as they ought to do when experience has confirmed or demonstrated the errors' existence." *Cleveland v. United States,* 329 U.S. 14, 22–23, 67 S.Ct. 13 [17], 91 L.Ed. 12, reh. denied 329 U.S. 830, 62 [67] S.Ct. 361, 91 L.Ed. 704 (1946), Rutledge, J., concurring.

See Tribe, *Constitutional Choices* (1985) at 31.

nor the Eighth Amendment to the United States Constitution:

"Excessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted,"

justifies this punitive and extreme judicial reaction which is a clear violation of the Wyoming Constitution and contrary to the mandates of the legislature.[3]

What this court now does is to rewrite both the intent and the practical effect of the 77–year-old law. The real result, however, is to eviscerate, at the option of the district judge, Ch. 49, S.L. of Wyoming 1984:

"7–13–423. Good time allowances; governor's power to promulgate rules; filing of rules.

"(a) The governor, after consultation with the state board of parole and the wardens of the Wyoming state penitentiary and the women's center, shall adopt rules and regulations to establish a system of good time and special good time allowances for inmates of the state penitentiary and the women's center. The rules may provide either for good time to be deducted from the maximum sentence or for good time to be deducted from the minimum sentence imposed by the sentencing court, or both.

"(b) The rules and regulations adopted by the governor as provided by this section shall be filed in the office of the secretary of state but shall at all times be considered rules relating to the internal management of the Wyoming state penitentiary and the women's center and not affecting private rights of inmates. The granting, refusal to grant, withholding or restoration of good time or special good time allowances to inmates shall be a matter of grace and not that of right of inmates."

Section 2 amended § 7–13–402(a):

"7–13–402. Powers and duties of board of parole generally.

"(a) The board may grant a parole, that is, permission to leave the confines of the institution in which the person is confined, to any person imprisoned in any institution under sentence ordered by any district court of this state other than a life sentence, provided the person has served the minimum term pronounced by the trial court less good time, if any, granted under rules promulgated pursuant to W.S. 7–13–423. If a convict has made an assault with a deadly weapon upon any officer, employee or inmate of any institution or has attempted to escape, escaped or assisted others to escape from any institution, he is not eligible for parole. In granting a parole the board shall fix terms and conditions it deems proper to govern the conduct of the parolee while the parole is in effect. The terms and conditions may be special in each case or they may be prescribed by general rules and regulations of the board, or both. No person granted a parole shall be released from an institution until he has signed an agreement that he will comply with the terms and conditions under which he has been released and abide by the laws of the state. The agreement shall be retained by the probation and parole office in the records of his office."

Section 4 provided:

"All rules and regulations adopted by the state board of parole prior to the effective date of this act, relating to good time and special good time allowances are adopted as the rules and regulations of the governor and shall continue to be effective until revised, amended, repealed or nullified pursuant to law."

The Governor, on July 6, 1984, promulgated regulations which continued a good-time allowance, to be reduced from the maximum sentence, in the amount of ten days per month, by retaining provisions

---

**3.** The Wyoming Constitution should be considered and defined to provide greater protection to its citizens' individual rights than may be afforded them under the federal constitution. Decisions should be based first upon the state constitution "which protects fundamental rights independently of the United States Constitution." *State v. Gilmore,* 103 N.J. 508, 511 A.2d 1150, 1157 (1986).

which have existed since 1909 with modest changes. See Appendix A, Rule promulgated by Governor Herschler July 6, 1984. Additionally, the rule established a new special good-time allowance, to be reduced from the minimum sentence, not to exceed 15 days per month, with accrual right to commence after six-months confinement. See Appendix B, Special Good Time Allowance, Wyoming State Penitentiary Rules.

As a result of the statute and rule, ultimate authority for granting good time affecting the maximum sentence is vested in the parole board, and that good time can be revoked and restored. See Appendix C, Special Good Time Awards, Wyoming State Board of Charities and Reform, July, 1984. Conversely, special good time affecting the minimum sentence is granted by the warden, and once granted is not subject to revocation.

The relationship of special good time to sentence time served is also to be recognized. Serving to reduce the minimum sentence, the allowance does not assume any early release unless the parole board approves, since parole can be granted at any time after the minimum sentence has been served.[4] For this reason, the special good time expands parole board jurisdiction effectuated by the warden's special good-time allowance.

4. Statistical analysis of the operation of special good time is not yet sufficient to project ultimate effect. The initial six months reveals about a 20 per cent credit for inmates, and 52 per cent status of no credit whatsoever, with a rough analysis indicating that of the available inmates (not including life and death penalty cases) the average reduction factor for all inmates, affecting minimum sentence terms, is probably less than 10 per cent of the total sentence time. Statistics provided by Warden Judith Uphoff include special good time awarded female prisoners:

"7-1-84 to 6-30-85 24 inmates received 590 days

Average: 2.5 days per inmate [per month]

"7-1-85 to 6-30-86 22 inmates received 849 days

Average: 3.9 days per inmate [per month]"

The point to be made is that this intentional effort of the judiciary to avoid an indeterminate sentencing requirement not only abrogates the intent of the legislature in providing a differentiated minimum and maximum sentencing arrangement, but also directly affects the capability of the executive branch of government through the penitentiary wardens to implement the good-time statute, and denies to the parole board the opportunity to handle parole decisions. A unitary (determinate) sentence will probably mean, in most cases, that parole time will not exist in the absence of commutation by the governor. Legislative intent for penal system operation is frustrated by this perversion of the statute.

The effect of the judiciary invasion of the separation of power article in the Wyoming Constitution is vividly illustrated by the present decision of the court. Article 2, § 1 provides:

The powers of the government of this state are divided into three distinct departments: The legislative, executive and judicial, and no person or collection of persons charged with the exercise of powers properly belonging to one of these departments shall exercise any powers properly belonging to either of the others, except as in this constitution expressly directed or permitted."

Information from Warden Duane Shillinger reflects special good time awarded male prisoners:

"Enclosed are the results of the 'special' good time allowances during the period of March, 1986 through August, 1986. During this report period the total offender population reached 870 on August 7, 1986. The highest 'inhouse' population of 685 was recorded on August 29, 1986. The average population during the report period was 838. During this report period 731 (in-house) inmates were reviewed for special good time awards, in accordance with State Statute 7-13-423. "In summary:

15.18 percent received full good time credits
28.59 percent received partial good time credits
54.72 percent received no good time credits."

This decision intrudes into both the legislative and executive function of government. It is unquestioned by authority and reason that the legislature determines existence of crimes and the penalty for violation, which includes the sentencing term and process. See *Cook v. State,* Wyo., 710 P.2d 824 (1985); *Williams v. State,* Wyo., 692 P.2d 233 (1984). This court is neither justified nor empowered to rescind the 1909 enactment which established indeterminate sentencing or repeal subsequent legislation establishing the parole board's function which is to ameliorate confinement time to be served.

The practical result should be examined. With a maximum sentence, Duffy can only be released early by accumulated good time, special good time, or gubernatorial commutation, excluding relief from federal courts which may otherwise find that constitutional rights have been violated by this punitive process.

If his conduct does not justify those benefits, then no question is created. Assuming to the contrary that he is a model prisoner, he could accumulate time so that the parole board grants a maximum good time on his initial 25–year sentence on the 10 days per month, reducing the maximum to the range of 18 years of confinement when his sentence would totally expire.

Conversely, in regard to the minimum sentencing and the special good time, the delayed commencement date and greater difficulty of attainment would probably mean that the minimum would be greater than the maximum so that parole board supervision for any period would be totally excluded. The purpose of the law in establishing a differential between the maximum and minimum was to afford credit to the inmate for problem-free service of his sentence—a benefit to the institution—and authority to the parole board for a period of suspension upon release.

*The sentences in this case of a one-day differential between the minimum and the maximum clearly violate statutory construction and the intent of the statute.*[5] Additionally, that intent was reinforced in 1984 with the passage of legislation granting authority to effectuate the good-time and the special-good-time factors in sentencing application.[6]

One final note: It is an axiom of the separation of powers of government, in the capability of the legislature to control not only budgeting but also the definition of crimes and the extent of punishment, that judicial efforts to contravene legislative intent can cause diminished judicial discretion by the consequent amendatory legislation.

### Case Law Precedent

Judicial efforts to characterize indeterminate sentencing statutes as determinate sentencing is not without historical precedence in sister states. Noteworthy is that in Wyoming no case to this date has discussed any possible rational standard for

---

5. Characterizationally applicable is the explicatively direct comment of Justice Frankfurter in *Helvering v. Hallock,* supra n. 2, 309 U.S. at 117, 60 S.Ct. at 450:

 " * * * Such an essay in linguistic refinement would still further embarrass existing intricacies. It might demonstrate verbal ingenuity, but it could hardly strengthen the rational foundations of law."

6. Actually, for a period of time good time was applied to the minimum. The change initially occurred with the passage of Ch. 92, S.L. of Wyoming 1971, which repealed the historical good time first enacted by Ch. 14, S.L. of Wyoming 1883.

 There are still inmates in the penal institutions who received historical good time under that law as applied to minimum time. After effectuation of the 1971 act by the parole board, no good time as applied to the minimum was granted until passage of the 1984 act, as resisted strongly by trial judges and at least one member of this court who appeared in opposition at legislative sessions in 1983 and 1984. See House Bill 25, 1983, House Journal 1983; House Bill 159, 1984, House Journal 1984. The 1984 act was a response to pervasive overcrowding problems and institutional needs of good behavior incentive, especially as applied to long-term sentences. Reemphasized interest in flexible sentencing standards and some minimization of uncontrolled discretion of the sentencing jurist was also indicated by the text and results of the sentencing modification provisions afforded by the law.

determinate sentencing derived from legislative intent.[7]

Only the dictum comment in the concurrence in *Jahnke v. State*, supra, lends credence to this new sentencing standard. See *Carey v. State*, Wyo., 715 P.2d 244 (1986); *Seeley v. State*, Wyo., 715 P.2d 232 (1986); *Holmes v. State*, Wyo., 715 P.2d 196 (1986); *Williams v. State*, supra; *Cook v. State*, supra, 710 P.2d at 826: " 'It is for the legislature to determine whether [a new approach] should be adopted,' " quoting from *Williams v. State*, supra; *Wright v. State*, Wyo., 670 P.2d 1090, reh. denied 707 P.2d 153 (1983); *Daniel v. State*, Wyo., 644 P.2d 172 (1982); *Peterson v. State*, Wyo., 586 P.2d 144 (1978).

Other states have soundly rejected sentences similar to those which were imposed in this case.

The early leading case was *Ex parte Collins*, 51 Mont. 215, 152 P. 40 (1915), which involved a statute similar to present Wyoming law and a sentence of an identical minimum and maximum term. In categorically rejecting the trial court sentence the Montana Supreme Court stated:

" * * * [T]he conception of the Legislature, as indicated by the use of the term 'indeterminate,' was that the minimum and maximum terms fixed should be so adjusted as to allow a substantial period of time to intervene during which the application for parole might be made, and the Governor and board of prison commissioners might determine its merits by inquiry touching the conduct of the applicant, in order to ascertain whether or not he has exhibited a disposition to reform, and hence is entitled to invoke the discretionary power lodged in them. This being manifestly the end sought to be accomplished, it is mandatory upon the courts to enforce the statute in every case, according to its spirit. It is not to the purpose to say that the provision does not prohibit the fixing of the minimum and maximum so that both will expire on the same date, because they may, in the nature of things, approach each other until the difference disap-

---

7. The analogy of C. Lester Gaylord in his article, *The Pony Farm: A Tale of Disproportionate Sentencing*, 91 Case and Comment (July-August 1986), is philosphically thoughtful:

" 'So, Fred,' I say, 'since none of these cases claims to overrule the earlier ones, we are at this interesting point in the law: a.) Legislatively mandated punishments disproportionate to the offense are constitutionally prohibited as cruel and unusual punishments; but b.) Disproportionate punishments imposed within legislatively mandated limits will not be interfered with by the Court because legislatively mandated punishments are merely societal decisions; and the court will not interfere in societal decisions; however c.) The imposition of a disproportionate punishment, even though legislatively mandated and therefore a societal decision, is cruel and unusual punishment and, therefore, is unconstitutional and prohibited.'

"Fred sits there looking at me, thoughtfully, slowly worrying a toothpick around in his mouth, trying to make sense of what I have said; but there is no sense to it, of course, unless it is looked upon in a certain light.

" 'What are my chances?' he says.

" 'None,' I say.

" '*None*?' he says, angrily, 'and you call that justice?'

" 'Why, no,' I say, surprised that he should even suggest that. 'I wouldn't call it *that*.

What I *would* call it' (and here I brush my hand over my research notes in general reference to them) 'is an interesting study on the sensitivity thresholds of the individual justices of the Court. I mean, no matter what they may claim to the contrary (and they do claim to the contrary), the cruel and unusual punishment clause is merely a reflection of their consciences. It has no life or warmth of determinable meaning of its own. It merely reflects *them;* it tells us what *they* are like inside.'

" 'No, Fred,' I say, warming up to the subject, 'what *I* would call it is an obvious manifestation of subliminal attitudes cloaked in a patina of juridical objectivity, resulting in paradoxical precedents with an occasional dangling modifier. Or, to put it more simply ...'

"But, before I can put it more simply, he reaches for his ten-gallon hat, puts the toothpick in his vest pocket, walks stiffly to the door, as if he has been breaking horses all day, and leaves."

The comments of the trial judge in this case in regard to the Hopkinson case as he was sentencing Duffy give credence to a supposition that in some way Hopkinson was being resentenced and the public defender's office was being punished. Unfortunately, Duffy, who was foolish enough to have removed the prior judge by motion exclusion, received the detriment of the resulting sentence.

pears. This view is not in accord with the spirit of the provision, and would defeat effectually the purpose had in view by the Legislature. It is entirely clear that the jury in returning the verdict in question here, and the court in pronouncing the judgment, ignored the spirit and purpose of the provision * *." 152 P. at 41.

The subject was also considered in Annot., 29 A.L.R.2d 1344:

"The few cases upon this subject support the principle that, under an indeterminate sentence law, the sentence cannot be for a definite term of imprisonment, but must be for not less than a specified period of time and for not more than a specified period, and there must be a difference between such periods, so that a sentence under such a law fixing identical minimum and maximum terms of imprisonment is invalid."

Applicable to Wyoming law [8] is the similar status of Illinois law where trial-judge proclivity to override the legislatively adopted standard of indeterminate sentencing has been considered in some fashion by appeal in more than a score of cases.

Factually comparable is *People v. Harper*, 50 Ill.2d 296, 278 N.E.2d 771 (1972), where a convicted robber was sentenced to a minimum of 20 years and a maximum of 20 years and one day. There the court said:

"* * * The clear intent of [our] provision for indeterminate sentences is to encourage rehabilitation of prisoners by holding out the possibility of early release on parole. While the sentence [imposed] may comply with the letter of the Sentence and Parole Act, we are of the opinion that it does not comply with its intent. * * * Since prisoners are not eligible for parole until they have served

the minimum term (less good time) of an indeterminate sentence * * *, it is obvious that the effect of this sentence was to foreclose any possibility of consideration for parole." 278 N.E.2d at 774.

*Harper* is cited with approval in *People v. Viser*, 62 Ill.2d 568, 343 N.E.2d 903, 913 (1975).

Another case explaining the rationale behind indeterminate sentencing is *People v. Scott*, 117 Ill.App.2d 344, 253 N.E.2d 553 (1969):

"* * * When there is a substantial spread between the minimum and the maximum of a sentence the inmate in the institution can be directed toward academic or vocational training, and favorable prospective parole consideration operates as quite a catalyst. The existence of a substantial spread between the minimum and the maximum ensures the availability to the defendant of supervision after incarceration. The principle of indeterminacy of sentence necessarily leaves to the professionals in the behavioral sciences the determination of the optimum date for release. The court, in fixing the maximum, determines the total length of possible incarceration." 253 N.E.2d at 555–556.

*Scott* is cited with approval in *People v. Allen*, 35 Ill.App.3d 342, 341 N.E.2d 431, 437 (1976).

Addressing the greater likelihood that an inmate will strive to become rehabilitated and law-abiding under an indeterminate sentencing scheme is the oft-quoted case of *People v. Lillie*, 79 Ill.App.2d 174, 223 N.E.2d 716 (1967):

" 'It is generally true that rehabilitation is best achieved under a system which gives great discretion to the parole authorities.' * * *

\* \* \* \* \* \*

8. Determinate sentencing within the Wyoming indeterminate sentencing law has apparently only been attempted three times in the history of the law. On the first occasion, District Judge Brown (now Justice Brown) gave a near identical maximum-minimum sentence to Russell Payne, which matter was not appealed, Roberts, *The Changing Structure of Criminal Sentencing,* XVIII Land & Water L.Rev. 591 (1983). The case involved parental homicide. The second case is the one presently before this court, as well as a third case which has now also reached this court on appeal. The "opportunity" now authorized by this court can be expected to propagate in an expedited fashion.

" * * * The hope of earl[y] release is a great incentive to a prisoner to participate in the educational and rehabilitation programs provided in modern penal institutions. Excessive minimum sentences, imposed by the courts, may defeat the effectiveness of the parole system by making mandatory the incarceration of a prisoner long after effective rehabilitation has been accomplished." 223 N.E.2d at 718–719.

Two of the cases citing *Lillie* are *People v. Harris*, 40 Ill.App.3d 204, 351 N.E.2d 890 (1976), and *People v. Jacque*, 131 Ill.App.2d 365, 266 N.E.2d 514 (1970).

" * * * A true indeterminate sentence is one with a sufficient difference between the minimum and maximum limit which will allow the prisoner an opportunity for parole. Because of its excessive minimum, a sentence of four to five years [for violating the terms of a bail bond] effectively denies this opportunity; it mitigates against the philosophy of the statutory provisions with regard to parole." *People v. Jacque*, supra, 266 N.E.2d at 515.

Citing *Jacque* with approval is *People v. Buxton*, 28 Ill.App.3d 429, 328 N.E.2d 703 (1975). In *Buxton*, the court examined a sentence for murder of not less than 100 years nor more than 101 years imprisonment, and modified the minimum term to provide for at least 33 years imprisonment in order to comport with *Jacque*'s mandate of "a sufficient difference" between the minimum and maximum limits.

"Under an indeterminate sentence law, the court cannot fix the minimum and maximum terms of imprisonment to expire at the same time, and, although there is authority to the contrary, such identical minimum and maximum terms constitute a definite, determinate sentence which do not comply with the law * * *." 24 C.J.S. Criminal Law § 1582, p. 572.

See also 24B C.J.S. Criminal Law § 1993, p. 622.

Support for the rule stated included cases from Alabama: *Jones v. State*, 23 Ala.App. 384, 125 So. 898 (1930); Illinois: *People v. Westbrook*, 411 Ill. 301, 103 N.E.2d 494, 29 A.L.R.2d 1341 (1952); Massachusettts: *McDonald v. Commonwealth*, 173 Mass. 322, 53 N.E. 874 (1899); Michigan: *Re Cummins*, 138 Mich. 39, 100 N.W. 1008 (1904); see also *People v. Duffy*, 67 Mich.App. 266, 240 N.W.2d 771 (1976); *People v. Buchanan*, 49 Mich.App. 574, 212 N.W.2d 290 (1973); Montana: *Ex parte Collins*, supra; New Jersey: *State v. Moore*, 21 N.J.Super. 419, 91 A.2d 342 (1952); Vermont: *In re Parent*, 125 Vt. 475, 218 A.2d 717 (1965), "In fact, the trial court set an identical maximum and minimum term, which is acknowledged to be contrary to the spirit and intent of the statute, and is error."

In *In re Petition of Callahan*, 348 Mich. 77, 81 N.W.2d 669, 670–671 (1957), that court stated:

"The legislature has exclusive power to determine the length of imprisonment for a felony. That power is not subject to judicial supervision, the function of the court being only to impose sentence under and in accord with the statute. *In re Doelle*, 323 Mich. 241, 35 N.W.2d 251; *People v. Harwood*, 286 Mich. 96, 281 N.W. 551, and cases therein cited. In so doing the court performs a ministerial function with discretion confined to the limits permitted by the statute."

See also *State v. Ross*, 20 Wash.App. 448, 580 P.2d 1110 (1978), wherein the judge attempted to impose not only the maximum sentence but also the minimum, and the Supreme Court agreed that under state law no authority was vested in the trial judge to set a minimum sentence, and jurisdiction was vested in the Board of Prison Terms and Paroles.

The Arizona Supreme Court, in *Ard v. State ex rel. State Superior Court of Pima County*, 102 Ariz. 221, 427 P.2d 913, 916 (1967), stated:

" * * * [The] statute sets forth the maximum term which the court may fix in imposing an indeterminate sentence. [It] does not authorize pronouncement of a fixed or determinate sentence."

Additional states with persuasive authority include Colorado: *O'Day v. People*, 114 Colo. 373, 166 P.2d 789 (1946); Florida: *Valdes v. Florida*, Fla.App., 469 So.2d 868 (1985), "The trial court is without authority to prevent gain time"; Nebraska: (with a detailed proportionate sentencing provision), *State v. Thomas*, 209 Neb. 304, 307 N.W.2d 128 (1981); *State v. Suggett*, 189 Neb. 714, 204 N.W.2d 793 (1973), " 'When the intent of the Legislature is clear, it is the duty of the courts to construe it in accordance with such intent. A sensible construction will be placed upon it to effectuate the object of the legislation rather than a literal meaning that would have the effect of defeating the legislative intent,' " quoting from *Keller v. State Department of Roads*, 184 Neb. 853, 172 N.W.2d 782 (1969); *State v. Rubek*, 189 Neb. 141, 201 N.W.2d 255 (1972); New Jersey: *State v. Janiec*, 25 N.J.Super. 197, 95 A.2d 762, 764 (1953), " 'Only the Legislature may ordain the punishment for crime and the sentencing court may not impose a sentence inconsistent therewith. * * * "Under an indeterminate sentence law, the court cannot fix the minimum and maximum term of imprisonment to expire at the same time," ' " quoting from *State v. Moore*, 21 N.J.Super. 419, 91 A.2d 342, 345 (1952); New York: *People v. Callahan*, 19 A.D.2d 889, 244 N.Y.S.2d 766, 767 (1963), cert. denied 376 U.S. 966, 84 S.Ct. 1130, 11 L.Ed.2d 983 (1964), with an indefinite term, the court cannot "add as an incident to such sentence its recommendation that defendant shall remain in prison for any definite period of time," citing *People v. Tower*, 308 N.Y. 123, 123 N.E.2d 805 (1954); *People v. Hassin*, 48 A.D.2d 705, 368 N.Y. S.2d 253 (1975); Pennsylvania: *Commissioner v. Marshall*, 254 Pa.Super. 275, 385 A.2d 1017 (1978); Texas: *Thomas v. State*, Tex.Cr.App., 587 S.W.2d 707 (1979).

Nevada, in *Spillers v. State*, 84 Nev. 23, 436 P.2d 18, 23, overruled on other grounds, *Bean v. State*, 86 Nev. 80, 465 P.2d 133 (1968), determined that:

"Nevada has adopted the indeterminate sentence concept—that is, the sentences where the maximum period imposed by the court subject to termination by parole after service of the minimum term. * * * [T]he court must supply the maximum in harmony with the theory of the indeterminate sentence—that is, a maximum which will allow for the possibility of parole. The court is not authorized to preclude the possibility of parole unless the legislature has expressly granted that authority."

In Michigan, *People v. Redwine*, 73 Mich. App. 83, 250 N.W.2d 550 (1976), a sentence of 23-24 months in prison was found to violate that state's indeterminate sentencing system and statute, and in *Jones v. State*, 23 Ala.App. 384, 125 So. 898 (1930), three years and one day was in violation of that state's indeterminate sentencing statute.

The philosophy and statutory construction standard was comprehensively considered by the New Jersey Superior Court in *State v. Moore*, 21 N.J.Super. 419, 91 A.2d 342 (1952).

"Imposing minimum and maximum terms of sentence identically alike operates as a restriction against the exercise of powers of parole delegated exclusively to the State Parole Board. It withdraws from that Board the consideration and the discretionary authority to determine that the prisoner has rehabilitated himself and is worthy of return to normal association with society and in the event of misbehavior to reincarcerate him. It is tantamount to a direction that at the expiration of the minimum sentence the prisoner must be released regardless of his state of rehabilitation, a direction which is not only akin to an encroachment upon the authority of the State Parole Board to determine such questions, but also contrary to the modern conception that the major purpose of the imposition of a punishment for criminal wrongs is reformation, rather than the old and now discredited theory of atonement." 91 A.2d at 344.

"Through the evolutionary changes in our system of administration of criminal justice the power and duty of determin-

ing questions of parole devolved upon the State Parole Board. This evolutionary development bespeaks an intent that the determination of questions of parole and the supervision of parolees were vested in the State Parole Board, distinct and separate from the judiciary. If such a sentence as here imposed were permitted, it would quite conceivably tend to thwart the legislative intendment of the parole system and remove the prisoner from the supervision of the Parole Board during that time which he is released upon parole and under surveillance until the expiration of time equivalent to the maximum prison term." 91 A.2d at 347.

See also *State v. Gledhill,* 129 N.J.Super. 113, 322 A.2d 471 (1974).

" * * * Thus the court in imposing sentence could fix a maximum term and also specify a *shorter* minimum. In the alternative, it could establish the maximum time for confinement without reference to a lesser time. But, as we have seen, insofar as the order sought to sentence the respondent to a term of not less than nine months, it was without force and effect." (Emphasis added.) *State v. Bruley,* 129 Vt. 124, 274 A.2d 467, 471 (1970).

In *Woodmansee v. Stoneman,* 133 Vt. 449, 344 A.2d 26 (1975), a six- to seven-year sentence was not sufficiently identical to be unacceptable. See also *People v. Pacheco,* 41 Colo.App. 188, 581 P.2d 741 (1978).

In *State v. Teat,* 24 N.C.App. 621, 211 S.E.2d 816, 819, cert. denied 286 N.C. 726, 213 S.E.2d 725 (1975), the court quoted 21 Am.Jur.2d, Criminal Law § 540, and stated:

" '[U]nder an indeterminate sentence law, a sentence cannot be for a definite term of imprisonment. It must be for not less than specified minimum period and not more than a specified maximum period. There must be a difference between the periods, and a sentence fixing identical minimum and maximum terms of imprisonment is invalid.' "

See also *Dixon v. State,* 260 Ark. 857, 545 S.W.2d 606 (1977), where an indeterminate

sentencing statute required sentencing adjustment.

" * * * We recognize that in our tripartite system of government it is the function of the legislative branch to define crimes and prescribe punishment, and that such questions are in the first instance for the judgment of the Legislature alone." *In re Lynch,* 8 Cal.3d 410, 105 Cal.Rptr. 217, 503 P.2d 921, 923 (1972).

The indeterminate sentence system in effect at the time of that case has since been changed.

Only cases in New Mexico and Tennessee stated a contrary rule.

The New Mexico Supreme Court, in *State v. Davisson,* 28 N.M. 653, 217 P. 240 (1923), specifically rejected Montana authority and accepted as a discretionary attribute of the indeterminate sentence that the minimum and the maximum could be the same. The New Mexico result was achieved by ignoring the legislative-intent question and employing the literalist theory of statutory interpretation by use of the words "without regard for the purpose intended" to be accomplished by the legislative pronouncement. Appeal to the United States Supreme Court was dismissed for want of jurisdiction.

The history of New Mexico sentencing law as thereafter developed is interesting if not prophetic. Similar to Wyoming, the New Mexico indeterminate sentence statute had been passed in 1909, *Owens v. Swope,* 60 N.M. 71, 287 P.2d 605, 607 (1955), cert. denied 350 U.S. 954, 76 S.Ct. 343, 100 L.Ed. 830 (1956), in N.M.S.A.1953, § 41–17–1. Amendments of a moderate nature followed until the entire sentencing statute was redefined by 1977 N.M. Laws Ch. 216. See Note, *Definite Sentencing in New Mexico: The 1977 Criminal Sentencing Act,* 9 N.M.L.Rev. 131 (1979). As the result of the change afforded by that statute and the 1980 amendments, the earlier broad discretionary jurisdiction of the district court was severely diminished and a determinate approach adopted, with the particular area of discretion to diminish

actual time served now primarily vested in the penitentiary warden by virtue of the operation of good time pursuant to N.M.S. A.1978 § 33–2–34. See 9 N.M.L.Rev. 131, supra.

By virtue of the discontinuance of the indeterminate sentencing standard, the *Davisson* case no longer has any efficacy in New Mexico law.

The case itself was first reconsidered in *Swope v. Cooksie*, 59 N.M. 429, 285 P.2d 793, 794 (1955), and the Supreme Court resolved: "Since this matter was not raised in the lower Court the same will not be passed upon here." See also *Owens v. Swope*, supra.

Other New Mexico cases did not discuss the determinate result as the indeterminate sentencing structure was analyzed. *French v. Cox*, 74 N.M. 593, 396 P.2d 423, 426 (1964):

"* * * [U]nder the indeterminate sentence law, the prisoner can only claim his debt to the state as being satisfied, as of right, upon expiration of the maximum period fixed by his sentence, less such good conduct time as may be provided by statute. The minimum sentence, less good time, merely fixes a date when, as a matter of grace and not of right, the prisoner may be permitted to serve the balance of his sentence outside the penitentiary, under such circumstances and conditions as the parole authorities may provide."

See also *State v. Maestas*, 63 N.M. 67, 313 P.2d 337 (1957). It is noteworthy and emphasized in New Mexico cases that "it is for the legislature to determine what act shall be regarded as criminal and how they shall be punished", *State v. Peters*, 78 N.M. 224, 430 P.2d 382 (1967); *State v. Hovey*, 87 N.M. 398, 534 P.2d 777 (1975); *State v. Sinyard*, 100 N.M. 694, 675 P.2d 426 (1983), cert. denied 100 N.M. 689, 675 P.2d

421 (1984); *State v. Sparks*, 102 N.M. 317, 694 P.2d 1382 (1985).

The other state which followed the minority rule now advanced by this court is Tennessee. *State ex rel. Brinkley v. Wright*, 193 Tenn. 26, 241 S.W.2d 859 (1951); *Hensley v. State*, 166 Tenn. 551, 64 S.W.2d 13 (1933); *Landers v. State*, 157 Tenn. 648, 11 S.W.2d 968 (1928). The determinate construction of an indeterminate sentencing status was likewise not acceptable to the Tennessee legislature, and the law has since been changed so that a sentencing differential between the maximum and minimum is required. T.C.A.1982 Replacement Vol. 7A, § 40–2107. See *State v. Duffel*, Tenn.Cr.App., 631 S.W.2d 445 (1981); and *State v. Mays*, Tenn.Cr.App., 677 S.W.2d 476 (1984); Tennessee Criminal Sentencing Reform Act of 1982, T.C.A. § 40–35–101 et seq.

Consequently, Wyoming will have no authority from presently existing case law in any jurisdiction which will support the position now adopted precedentially. Not only is the present decision not supported by prior decisional authority from Wyoming, but now not even by the minority rule previously followed in New Mexico and Tennessee.

The change desired in this matter is a prerogative of the legislature and not of this court. When the legislature prescribes an indeterminate sentence for the conviction of a crime, the trial court has no power or discretion to substitute its own judgment for that of the legislature. See *Williams v. State*, supra, 692 P.2d 233.

In summary, it can be said with certainty that not only is the present decision of this court contrary to clear legislative intent and purpose and without significant precedential authority in Wyoming law, but also now stands alone in regard to the interpretation of indeterminate sentencing statutes in any sentencing jurisdiction of this nation.[9]

---

9. The majority opinion, no matter what it linguistically states, provides a new contention by case citation and logic that one year, two years, or five years, is the same as one day. If true, then one second should similarly serve. None is true if time is to be invested in penitentiary confinement. The legislature is then invited to correct the court's judicial misinterpretation, and inevitably that will occur as society mandates, and probably not in a form that will be

### Illegal Sentence Correction Under Rule 36, W.R.Cr.P.

No justified basis is seen in this appeal for disregarding the question of the legality and constitutionality of the two consecutive sentences for the same transaction by leaving the issue for a succeeding proceeding under Rule 36, W.R.Cr.P., which provides:

".The court may correct an illegal sentence at any time and may correct a sentence imposed in an illegal manner within the time provided herein for the reduction of sentence. The court may reduce the sentence within 120 days after the sentence is imposed, or within 120 days after receipt by the court of a mandate issued upon affirmance of the judgment or dismissal of the appeal, or within 120 days after entry of any order or judgment of the Supreme Court having the effect of upholding the judgment of conviction. The court may also reduce a sentence upon revocation of a probation as provided by law.",

or a new proceeding instituted under § 7-14-101, W.S.1977:

"Any person imprisoned in the penitentiary who asserts that in the proceedings which resulted in his conviction there was a substantial denial of his rights under the constitution of the United States or of the state of Wyoming, or both, may institute proceedings under this act [§§ 7-14-101 to 7-14-108]. The proceeding shall be commenced by filing with the clerk of the court in which the conviction took place a petition verified by affidavit, together with a copy thereof, which copy shall be forwarded by the clerk of court to the attorney general of the state of Wyoming by certified or registered mail. The clerk shall docket the petition upon his receipt thereof and bring the same promptly to the attention of the court. No proceeding under this act shall be commenced more than five (5) years after the conviction and sentence of the accused, unless the petitioner alleges facts showing that the delay was not due to his own neglect."

If this court had wanted additional briefs on the question of double sentencing under different statutes invoking the constitutional issue of double jeopardy, rebriefing at this time would have been highly preferable so that this appeal would have determined the defendant's sentencing status.

If this case reaches the federal court, surely it would be preferable that a conclusion would have been reached by this court. By this delay in the judicial processes we simply involve more people at additional public cost in order to determine a clearly implicated constitutional and statutory issue of construction.

### Duplicitous Sentencing—Double Jeopardy

In midsummer 1985, Scott Duffy, a young man with a most unsavory criminal history, was incarcerated by the State of Colorado at its Castle Rock half-way house. Some time immediately prior to early July, he made telephone calls to an ex-girl friend,

perceived as desirable by the trial judiciary. Furthermore, the opinion misapprehends the difference in concept, availability and potential withdrawal of good time from special good time, and is in error, under present rules, in analysis of § 7-13-402(a), as amended by Ch. 49, S.L. of Wyoming 1984.

Parenthetically, I would observe that none of the cases cited in the majority opinion encompass a one-day or one-second time differential. *Daniel v. State,* supra. Paraphrased generally, if we do not learn from the history of what happened in New Mexico and Tennessee, which alone manifested the rule professed by the majority as then repealed by the legislature, when the courts "determined" indeterminate sentencing laws, the Wyoming judiciary now will be condemned to anticipate that history will repeat by elimination of the Wyoming system existent for nearly eighty years. The topic of the dissent has nothing to do with reduction of sentences by appellate courts. It only relates to sentences that were in violation of both the spirit and the text of the historical Wyoming sentencing law. "History is philosophy teaching by example." Dionysius. As Justice Holmes has stated, "A page of history is worth a volume of logic." For an excellent analysis of present problems, see Spader, *Megatrends in Criminal Justice Theory,* 13 American Journal of Crim.Law 157 (1986).

Michelle Frey, or an acquaintance, Richard Sweaney, with information about their prospective burglary of the house of his grandmother, Ada Johnson, in Lander, Wyoming. His purpose was for them to get money to return to Colorado and secure his release. In company with a third person, those two proceeded in their criminal endeavor to a break-in at the residence and physical robbery of Mrs. Johnson, with brutality and extreme threat of physical harm. The triumvirate were soon discovered, captured and in confession implicated Duffy in the original enterprise. Good cause for a heavy sentence was clearly justified upon the Duffy plea of guilty, raising as an issue the determinate sentence and the consecutive sentence imposed for his act of criminal conduct.

The information stated:

"COUNT I

"1. The Defendant, SCOTT LEE DUFFY;

2. on or about July 4, 1984;

3. in Fremont County, Wyoming,

4. took and carried away;

5. property; jewelry, a handgun, and other property;

6. of another, Ada Johnson;

7. with the intent to deprive the owner;

8. and in the course thereof intentionally put Ada Johnson in fear of immediate bodily injury;

9. by the exhibition of a deadly weapon; a firearm;

10. the defendant is charged with the above crime in that he aided and abetted others in the commission of said crime as proscribed by Sections 6–1–201(a)(b)(i) and 6–2–401(a)(ii), W.C.C. [sic] 1982.

"COUNT II

"1. The Defendant, SCOTT LEE DUFFY;

2. on or about July 4, 1984;

3. in Fremont County, Wyoming;

4. agreed with Michele Frey and Richard Sweaney;

5. that one or both of them;

6. would commit a crime; burglary of Ada Johnson's home, 1000 N. 5th Street, Lander, Wyoming;

7. and on July 4, 1984, Michele Frey and Richard Sweaney acted overtly to effect the objective of the agreement, "such facts constituting a violation of Sections 6–1–303 and 6–3–301(a), W.C.C. [sic], 1982, and so did contrary to the form of the statute in such case made and provided, and against the peace and dignity of the State of Wyoming."

The issue of invalid double charge for one crime was not raised prior to plea nor specifically addressed before this court except by comment at oral argument when an invitation for rebriefing was extended by the public defender.

The obvious purpose of the double charge was to make available sentencing in excess of the 25 years established by the legislature as the maximum permitted for aggravated robbery.

Invoked is a series of seven consistent Wyoming cases which imply a contrary result only, discussed in *State v. Carter*, Wyo., 714 P.2d 1217 (1986), Urbigkit, J., dissenting; *Jerskey v. State*, Wyo., 546 P.2d 173 (1976); *Dycus v. Wyoming*, Wyo., 529 P.2d 979 (1974); *Boyd v. State*, Wyo., 528 P.2d 287 (1974), cert. denied 423 U.S. 871, 96 S.Ct. 137, 46 L.Ed.2d 102 (1975); *Jackson v. State*, Wyo., 522 P.2d 1286 (1974); *Dorador v. State*, Wyo., 520 P.2d 230 (1974); *Loddy v. State*, Wyo., 502 P.2d 194 (1972), cert. denied 414 U.S. 1134, 94 S.Ct. 877, 38 L.Ed.2d 760 (1974); and *State v. Tobin*, 31 Wyo. 355, 226 P. 681 (1924).

The federal case law earlier reviewed for discussion in the dissent in Carter is greatly extended in number and there exist a similar number of state decisions.

The inclination for me to evaluate the law afforded in these very many cases is resisted by the reflection that comment in this dissenting opinion may serve as little authority in succeeding hearings which, by the decision of this court, will be held under Rule 36, W.R.Cr.P., § 7–14–101, W.S.

1977, or ultimately by succeeding proceedings in the United States District Court.

Personally, I would continue to follow Wyoming stare decisis in the transactional-rule teachings of Justice Blume in *State v. Tobin,* supra, and the six cases that followed, but review of *Blockburger v. United States,* 284 U.S. 299, 52 S.Ct. 180, 76 L.Ed. 306 (1932), and the federal rules will be left for the future. See *United States v. Rich,* 795 F.2d 680 (8th Cir.1986); *United States v. Bass,* 794 F.2d 1305 (8th Cir. 1986); *United States v. Rosenthal,* 793 F.2d 1214, 1245 (11th Cir.1986); *Brimmage v. Sumner,* 793 F.2d 1014 (9th Cir.1986); *United States v. Harrington,* 761 F.2d 1482 (11th Cir.1985); *United States v. Bankston,* 603 F.2d 528 (5th Cir.1979). See also *State v. Dunlop,* Alaska, 721 P.2d 604 (1986); *People v. Pearson,* 42 Cal.3d 351, 228 Cal.Rptr. 509, 721 P.2d 595 (1986); *People v. Crespin,* Colo., 721 P.2d 688 (1986); *Talancon v. State,* Nev., 721 P.2d 764 (1986); *State v. Hurst,* 82 N.C.App. 1, 346 S.E.2d 8 (1986); *State v. Fisher,* 80 Or.App. 45, 721 P.2d 854 (1986).

### APPENDIX A

### GOOD TIME ALLOWANCE FOR INMATES OF THE WYOMING STATE PENITENTIARY, HONOR FARM, AND WYOMING WOMEN'S CENTER

Section 1. *Authority.* The Governor, pursuant to Section 7–13–423, W.S.1977 (1984 Cum.Supp.) is authorized to promulgate rules governing a system of good time and special good allowance for inmates of the Wyoming State Penitentiary, Honor Farm, and Wyoming Women's Center.

Section 2. *Definitions.*

(a) "Good time allowance" is a reduction of the maximum sentence of an inmate in the amount of ten (10) days per month for each month served on a sentence as the result of the inmate's proper and helpful attitude, conduct and behavior in the institution and/or as a result of his or her adherence to the rules of the institution.

(b) "Special good time allowance" is a reduction of the minimum sentence of an inmate in the amount of fifteen (15) days per month for each month served on a sentence, except that special good time can begin only after an inmate has served six (6) months of a sentence. Special good time is earned as the result of an inmate's especially proper and helpful attitude, conduct and behavior in the institution and/or as a result of his or her conscientious and especially exemplary adherence to the rules of the institution.

(c) "Board" shall mean Board of Parole.

(d) "Institution" shall mean Wyoming State Penitentiary, Honor Farm, or Wyoming Women's Center.

Section 3. *Procedure to Determine Whether or not Good Time Should be Granted.*

(a) When an inmate is alleged to have an attitude, conduct, and/or behavior which is not good, proper and/or helpful and/or not to have adhered to the rules of the institution, he shall be furnished a written specification of the time, place and manner in which he has evidence such attitude, conduct and/or behavior and/or in which he has failed to adhere to the rules of the institution. He shall also be given a notice that a hearing will be held concerning the allegation(s) if he requests one within forty-eight (48) hours. If the inmate does not request a hearing, the warden shall review the evidence relative the allegation and determine the truth or falsity of the allegation. If found to be true, a determination of the number of months for which good time allowance shall not be granted or awarded shall be made. The determination shall be in writing and must include the basis for it and the number of months for which good time allowance shall not be granted or awarded.

(b) If a hearing is requested within forty-eight (48) hours, a hearing shall be afforded within five (5) working days (Saturdays, Sundays, and Holidays not included) by an officer of the institution who was not involved in the incident, occurrence or activity giving rise to the allegation, provided,

that if all officers of the institution were so involved, the hearing shall be afforded by a member of the Board. At the hearing, the inmate shall be allowed to hear the evidence against him, confront and cross examine the witnesses against him, and to present evidence and witnesses in his own behalf. If the warden conducts the hearing, he shall make a written summary and determination. If the warden does not conduct the hearing personally, the hearing officer shall make a written summary of the proceedings and evidence and shall make a recommendation to the warden upon a review of which the warden shall make a determination. In either event, the warden shall make a written summary of his determination of the truth or falsity of the allegations of the number of months for which good time allowance shall not be granted or awarded. If the warden is involved in the incident, occurrence or activity giving rise to the allegation, he may designate another officer of the institution not involved or a member of the Board to make the required review and to make the determination of the truth or falsity of the allegation, and the number of months for which good time allowance shall not be granted or awarded.

(c) All determinations so made, along with the summaries and recommendations of the hearing officers or of the warden shall be reported to the Board at its next regular meeting.

Section 4. *Withdrawal or Revocation of Good Time Allowance Which Has Been Granted or Awarded.*

(a) In addition to not granting or awarding good time allowance to an inmate under Section 3 of these rules, any good time allowance which has already been granted or awarded may be withdrawn or revoked by the Board from an inmate whose attitude, conduct and/or behavior has not been good, proper and/or helpful, and/or who has not adhered to the rules of the institution.

(b) The procedure for withdrawal or revocation of good time allowance which has been granted and awarded shall be that set forth in Section 3 of these rules, except that the Warden shall recommend the withdrawal of revocation of good time allowance and the extent thereof to the Board, and he shall notify the inmate in writing of the recommendation. The inmate may submit to the Board a written objection to the recommendation with the reasons therefor, within ten (10) days of the date of the warden's recommendation.

(c) At its next regular meeting, the Board will review the recommendation and objection, if any, together with the written summary and determination in the institutional file of the inmate, and may, in its discretion, receive evidence from the inmate and others. Based on this material, the Board shall determine whether or not to withdraw or revoke good time allowance already granted or awarded and the extent thereof, and, further, the Board shall cause the inmate to be notified in writing of such determination.

Section 5. *Restoration of Good Time Allowance.*

(a) The Board may grant or award to an inmate a good time allowance which has not been awarded or granted to him because a determination affecting him has been made under Section 3 of these rules, and which has been withdrawn and revoked under Section 4 of these rules. This shall be done by the Board after evaluation of the inmate's background, institutional history, attitude, conduct and behavior.

(b) The matter of restoration of good time allowance shall be considered by the Board when recommended by the institution's warden, or at the time of interview of the inmate for parole under the Parole Board rules.

Section 6. *Appeal.*

(a) Within thirty (30) days following the Board's failure to award or its action removing a good time allowance, the Governor shall approve or disapprove such actions of the Board. Any inmate wishing to communicate his objections to Board action under the above rules to the Governor

must do so within ten (10) days of the date of the Board's action.

Section 7. *Special Good time Awards.*

(a) Special good time may be awarded to any inmate not to exceed fifteen (15) days per month for every month after an inmate has completed serving six (6) months of his minimum sentence.

(b) The wardens of the institutions may consider any pertinent criteria, including but not limited to:

(i) Merit card or institutional classification level (e.g., segregation, maximum, medium, minimum, word release (etc.).

(ii) Successful completion of continuation of assigned work or duties.

(iii) Conduct, attitude, willingness to do assigned work or duties.

(iv) Participation in programs which are instrumental in inmate's rehabilitation.

(v) Management of personal affairs, such as getting along with staff and fellow inmates, avoiding unnecessary confrontations, or taking care of indebtedness.

(vi) documented violation of institutional rules.

(vii) Personal habits and hygiene.

(c) Awards of special good time are to be made at the sole discretion of the warden as outlined above and are not subject to loss as in the case with good time allowances.

(d) The wardens of the institutions may adopt such internal operating rules and procedures as are necessary to implement these rules administratively. The institutions' rules may include provisions for awarding special good time monthly, quarterly, semiannually, or annually at the warden's discretion.

Adopted this 6th day of July, 1984, at the City of Cheyenne, County of Laramie, State of Wyoming.

/s/ ED HERSCHLER
ED HERSCHLER
GOVERNOR

WYOMING STATE PENITENTIARY

CHAPTER XLIII

SPECIAL GOOD TIME ALLOWANCE

The Wyoming State Penitentiary, on July 1, 1984, was granted the privilege to award special good time allowances to those inmates who are not serving a life sentence, who have served six (6) months of their minimum sentence *in the penitentiary,* and who consistently adhere with the prison's rules and regulations, maintaining good attitude, conduct, and demeanor while doing so.

Special good time allowances are those good time awards given by the Warden, deducted from the minimum sentence, to inmates for "... especially proper and helpful attitude, conduct and behavior in the institution and/or as a result of his or her conscientious and especially exemplary adherence to the rules of the institution"— as quoted from the Governor's good time policy and procedure.

Therefore, provided that you adhere to the rules and regulations of the prison and maintain exceptional conduct and attitude, you may be eligible to earn special good time deductions, up to fifteen (15) days per month, from your minimum sentence.

*Section 1: Definition of "Special Good Time Award"*

Per the Governor's Policy and Procedure: "Special good time allowance is a reduction of the minimum sentence of an inmate in the amount of fifteen (15) days per month for each month served on a sentence, except that special good time can begin only after an inmate has served six (6) months of a sentence. Special good time is earned as the result of an inmate's especially proper and helpful attitude, conduct and behavior in the institution and/or as a result of his or her conscientious and especially exemplary adherence to the rules of the institution."

Therefore, the Warden may grant fifteen (15) days per month special good time allowance (not to exceed 180 days per year)

to be deducted from the minimum sentence. Only quality behavior and strict adherence to the rules and regulations will earn the special good time allowances.

*Section 2: Special Good Time Allowances Awarded by the Warden as Compared with Good Time Awarded by the Parole Board*

A. The Warden may grant up to fifteen (15) days special good time which is deducted from the minimum sentence.

B. The parole board may grant ten (10) days per month which is deducted from the maximum sentence.

C. The Warden may withhold special good time award, but the Warden must make recommendations to the parole board regarding the good time which is deducted from the maximum sentence;

D. Once given, special good time awards cannot be revoked by the Warden.

E. The parole board may act upon recommendations to revoke, withhold or restore the good time which influences the maximum sentence.

F. Basically, the special good time award determines the length of the minimum sentence and thereby influences dates for parole board appearances.

G. The good time deducted from the maximum sentence determines the "good time release" date and the amount of time that an inmate will serve on parole.

*Section 3: Administrative Obligation to Award Special Good Time*

Please understand that the Warden is *not* obligated to grant special good time awards to anyone. The Warden and prison administration are obligated to ensure that special good time awards when given are given to those who have *deservingly earned* such an award. For your information, Wyoming State Statute 7–13–423 states that "... the granting, refusal to grant, withholding or restoration of good time or special good time allowances to inmates shall be a matter of grace and not that of right of inmates."

*Section 4: Inmate Eligibility to Receive Special Good Time Awards*

A. An inmate must have actually served six (6) months of his minimum sentence *in the penitentiary* before special good time awards can be granted by the Warden.

B. Inmates who begin serving consecutive sentences must have served six (6) months of the minimum sentences of the consecutive sentence before becoming eligible to receive special good time awards.

C. Inmates must remain in "good standing" and exhibit exemplary adherence to the rules and regulations in order to become eligible to receive special good time awards; and,

D. Inmates may receive *no* special good time awards, a *partial* good time award, or the *full* fifteen (15) days allowance—all depending upon the inmate's cumulative status within the institution.

*Section 5: Granting Special Good Time Awards*

The employees and administration may use a variety of progress indicators as a means to decide whether or not special good time may be awarded. Inmate activity and inmate progress will determine the extent of special good time awards. Special good time awards may be based upon, but not limited to the following:

A. Merit card status:

"A" merit card may earn 0 to 15 days

"B" merit card may earn 0 to 10 days

"C" merit card may earn 0 to 5 days

"D" merit card may earn 0 days

"E" merit card may earn 0 days

B. In addition to the merit card level, progress or lack of progress in the following areas may determine whether or not special good time awards will be granted or withheld:

1. Classification level: Assignment to disciplinary segregation, restricted maximum segregation, maximum, medium, minimum, and work release may

be further basis for consideration of special good time awards.

2. Successful completion of and continuation of assignments.

3. Overall conduct, attitude and willingness to perform assigned activities.

4. Participation in programs which are considered to be of significance in terms of the inmate's skill and behavioral needs.

5. Management of personal affairs: Learning to live and work with fellow inmates, employees, and the community; avoiding illegal acts, such as fighting, drug use, vandalism; improving basic living skills; managing personal funds (avoiding indebtedness); and recognizing obligations, responsibility and duty shall all be of specific importance as good time allowances are considered.

6. Documented violation of institutional rules: Inmates may be placed in a capacity whereby they cannot earn good time awards for specific time periods when rule violations have been documented and substantiated.

7. Personal habits and hygiene: Demeanor, conduct, attitude, willingness to recognize and accept responsibility, consideration of others, cleanliness, grooming, and overall hygiene will be further considered as basis for awarding or withholding good time allowances.

NOTE: The Warden, unit managers, counselors, supervisors, security personnel, instructors, and other employees who work with the inmate on a daily basis will review an inmate's monthly progress. The Warden will render the final decision as to the extent of special good time credits.

NOTE: Good time allowance may be withheld, partially granted, or fully granted depending upon the inmate's progress and behavioral status.

*Section 6: Notification of Withholding of Special Good Time Awards*

A. The Warden may withhold special good time awards at any time once the Warden and/or his designees has substantiated that the inmate is not a deserving candidate to receive special good time awards.

B. The Warden will receive reports from counselors, security officers, work supervisors, instructors and all other employees significantly involved with the inmate in his daily activities. The Warden and his designees will review the reports, discuss the reports with individual inmates, and then make a decision as to the amount of special good time (if any) that each inmate has earned.

C. In many instances, the inmate will be advised by the classification and disciplinary committees of recommendations to withhold special good time allowances.

D. The Warden may also convene special good time review committees so as to review inmate progress and good time earning eligibility status.

E. Inmates will be well advised of any recommendation regarding the withholding of special good time awards, and he will be advised by the Warden and/or his designee why good time has been withheld.

F. Inmates will further be advised as to what actions are necessary to begin earning special good time awards.

*Section 7: Time Periods During Which Special Good Time Awards Have Been Withheld*

A. The first six (6) month period of the minimum sentence during which inmates are ineligible to earn special good time, will not be used in retroactive manner for the special good time awards.

B. Any period during which special good time awards have been withheld will not be used in a retroactive manner for special good time awards.

*Section 8: Revocation of Special Good Time Awards*

Per State Statute 7-13-423, the Warden may not revoke special good time once the special good time has been awarded.

*Section 9: Documentation and Records*

A. The Warden will submit special good time credits to the penitentiary records office after the first ninety (90) day period (i.e., on or about September 1, 1984) and every 180 days thereafter.

B. Special good time credits will be documented with reasons for the granting of the award as well as reasons for withholding the award.

C. Inmate records maintained by the Records office will reflect the following:

1. Monthly special good time credits;

2. Adjusted minimum sentence;

3. Parole board hearing schedule;

4. Reasons for withholding special good time credits.

D. The Governor, the Board of Charities and Reform, and the parole board will receive a copy of all special good time credits.

*Section 10: Inmate notification of good time awards*

A. Each month inmates may receive a verbal notification, upon request, relative to special good time credits.

B. On or near September 1, 1984, and each 180 days thereafter inmates will receive a written report advising the following:

1. Monthly good time award;

2. Total good time credits for the report period;

3. Adjusted minimum sentence;

4. Parole hearing schedule;

5. Reasons for withholding good time awards; and

6. Length of time period that good time awards will be withheld.

C. Inmates, at classification and disciplinary hearings, may also be notified of recommendations regarding good time status.

D. The "Special Good Time Allowance" report form on the following page will be used to document monthly good time allowances and to convey the sentence adjustment to the Records office, the inmate and other agencies as necessary.

*Section 11: Grievance Issues Related to the Warden's Decisions Regarding Special Good Time Awards*

A. Because State Statute 7-13-423 states that special good time awards are a matter of "grace" and not a right of the inmate, the Warden will not accept grievances which appeal the Warden's special good time awards and/or withholding of special good time awards.

B. Grievances will be accepted when the grievance specifically identifies fault in the prison administration's application and use of the special good time law as intended by the State Legislature and/or Governor.

## APPENDIX C

### STATE OF WYOMING BOARD OF CHARITIES AND REFORM
### WYOMING STATE PENITENTIARY

Section: 535

Subject: Special Good Time Awards

Date: July, 1984

### AUTHORITY

9-3-706, [now rewritten as § 25-1-104, W.S.1977] Wyoming Statutes, states that "The Board of Charities and Reform shall, besides such other powers as may be conferred upon it in accordance with the law, have general supervision and control of all such charitable, reformatory and penal institutions as may be established and supported by the State ..."; and 9-3-707, [now rewritten as § 25-1-105, W.S.1977] states that "The Board shall have power to direct the general management of all state institutions ..."

### PURPOSE

To establish policy and procedure which shall serve to define the conditions of implementation and management of special good time which shall be awarded by the

 Warden of the Wyoming State Penitentiary.

## POLICY

It shall be policy of the Wyoming State Penitentiary to implement and manage a special good time award program as authorized by Section 7-13-423, Wyoming State Statutes 1977 (1984 Supplement) and as directed by the Governor of Wyoming. Further, the penitentiary special good time award program shall be implemented in accordance with the good time policy and procedure signed by the Governor (refer to attached).

## PROCEDURE

The following subject categories will be addressed with specific procedural guidelines:

A. Definition of "special good time";

B. Inmate eligibility to receive special good time awards;

C. Granting special good time awards;

D. Notification of withholding of special good time awards;

E. Time periods during which special good time has been withheld;

F. Revocation of special good time awards;

G. Documentation and records;

H. Inmate notification of good time awards.

## A. DEFINITION OF "SPECIAL GOOD TIME" AWARD

The definition which will apply to special good time awards is as follows:

"Special good time allowance is a reduction of the minimum sentence of an inmate in the amount of fifteen (15) days per month for each month served on a sentence, except that special good time can begin only after an inmate has served six (6) months of a sentence. Special good time is earned as the result of an inmate's especially proper and helpful attitude, conduct and behavior in the institution and/or as a result of his or her conscientious and especially exemplary adherence to the rules of the institution."

## B. INMATE ELIGIBILITY TO RECEIVE "SPECIAL GOOD TIME" AWARDS

1. An inmate must have actually served six (6) months of his minimum sentence *in the penitentiary* before special good time awards can be granted by the Warden.

2. Inmates who begin serving consecutive sentences must have served six (6) months of the minimum sentence of the consecutive sentence before the Warden can award special good time awards.

3. Inmates must remain in "good standing" in all areas of interaction within the prison and prison programs in order to receive special good time awards.

4. Inmates may receive *no* special good time award, a *partial* good time award, or the *full* fifteen (15) day good time award—all depending upon the inmate's cumulative status within the institution.

## C. GRANTING "SPECIAL GOOD TIME" AWARDS

1. Special good time awards may be based upon, but not limited to, the following:

a. Merit card status:

A merit card = 0–15 days

B merit card = 0–10 days

C merit card = 0– 5 days

D merit card = 0 days

E merit card = 0 days

b. In addition to the merit card level progress or lack of progress in the following areas may determine whether or not special good time awards will be granted or withheld:

1. Classification Level: assignment to disciplinary segregation, restricted maximum segregation, maximum, medium, minimum, and work release, may be further basis for consideration of special good time awards;

2. Successful completion of and continuation of assignments may be for special good time allowance;

3. Overall conduct, attitude, and willingness to perform assigned activities;

4. Participation in programs which are considered to be of significance in terms of the inmate's skill and behavioral needs;

5. Management of personal affairs: learning to live and work with fellow inmates, employees, and the community; avoiding illegal acts, such as fighting, drug use, vandalism; improving basic living skills; managing personal funds (avoiding indebtedness); and recognizing obligations, responsibility and duty shall all be of specific importance as good time allowances are awarded;

6. Documented violation of institutional rules: inmates may be placed in a capacity whereby they cannot earn good time awards for specific time periods when rule violations have been documented and substantiated;

7. Personal habits and hygiene: demeanor, conduct, attitude, willingness to recognize and accept responsibility, consideration of others, cleanliness, grooming, and overall hygiene will be further considered as basis for awarding or withholding good time allowances.

NOTE: Good time allowance may be withheld, partially granted, or fully granted depending upon the inmate's progress and behavioral status.

2. Beginning July 1, 1984, inmates became eligible to receive special good time awards. A trial period from July 1, 1984, to September 1, 1984, will serve as the first period of good time awards. During this period awards will be granted in accordance with the written and approved rules and regulations. The Warden will then submit the written recommendations to the records office. Beginning September

1, 1984, good time allowance will be reported to the Records office every six (6) months, or as necessary depending upon the inmate's sentence status.

D. NOTIFICATION OF WITHHOLDING "SPECIAL GOOD TIME" AWARDS

1. The Warden may withhold special good time awards at any time once the Warden and/or his designees has substantiated that the inmate is not a deserving candidate to receive special good time awards.

2. In most instances, the classification committee and disciplinary committee will recommend the withholding of special good time while providing documented reasons for such a recommendation.

3. The Warden may convene additional review committees so as to review inmate progress and good time earning eligibility status.

4. Because special good time awards are designed to motivate an inmate to use socially acceptable behavior, the inmate, in order that he might better understand his actions and behavior, will be an active participant in all committees and reviews regarding good time awards.

E. TIME PERIODS DURING WHICH SPECIAL GOOD TIME HAS BEEN WITHHELD

Once the period for withholding good time awards ends, that period of good time withholding cannot be used to collect good time. In other words, good time awards are not retroactive to any past period.

F. REVOCATION OF "SPECIAL GOOD TIME" AWARDS

Once special good time awards have been awarded the given awards will not be subject to revocation.

G. DOCUMENTATION AND RECORDS

1. The Warden will submit written good time award information to the Records

office, at the end of the first ninety (90) day period and every 180 days thereafter, reflecting special good time awards and withholding of good time awards.

2. Special good time allowances will be documented with reasons for the granting of the award as well as the reasons for withholding the award.

3. Inmate records, maintained by the Records office, will reflect:

 a. Monthly awards,

 b. Adjusted minimum sentence,

 c. Parole Board hearing schedule.

4. The penitentiary will receive all prison farm good time recommendations so as to maintain consistent, accurate minimum sentence adjustments.

5. A quarterly report of all good time activities will be submitted to the following:

 Governor

 Board of Charities and Reform

 Parole Board

 District Court Judges upon request

 Additional reports will be submitted upon request.

6. The annual report will further reflect all fiscal period good time activity.

## H. INMATE NOTIFICATION OF "SPECIAL GOOD TIME" AWARDS

1. Inmates my receive a verbal notification each month relative the special good time allowance that was awarded;

2. After September 1, 1984, inmates will be advised in writing, once each 180 days, as to the following:

 a. Monthly good time award,

 b. Total good time credits,

 c. Adjusted minimum sentence,

 d. Parole Board hearing schedule,

 e. Reasons for withholding good time awards,

 f. Length of time period that good time awards will be withheld.

3. Inmates, at classification and disciplinary hearings, may also be notified of recommendations regarding good time status.

4. The attached "Special Good Time Allwoance" report form will be used to document monthly good time allowances and to convey the sentence adjustments to the Records office, the inmate, and other agencies as necessary.

## STATE OF WYOMING BOARD OF CHARITIES AND REFORM WYOMING STATE PENITENTIARY

Section: 535A

Subject: Special Good Time Awards for Community Corrections Placement

Date: January, 1986

## AUTHORITY

9-3-706 [now rewritten as § 25-1-104, W.S.1977] Wyoming Statutes, states that "The Board of Charities and Reform shall, besides such other powers as may be conferred upon it in accordance with the law, have general supervision and control of all such charitable, reformatory and penal institutions as may be established and supported by the State ..."; and 9-3-707, [now rewritten as § 25-1-105, W.S.1977] states that "The Board shall have power to direct the general management of all state institutions ..."

## PURPOSE

To establish policy and procedure which shall serve to define the conditions of implementation and management of special good time awards for inmates assigned to residential and nonresidential community corrections programs.

## POLICY

It shall be policy of the Wyoming State Penitentiary to implement and manage a special good time award program as authorized by Section 7-13-423, Wyoming State Statutes 1977 (1984 Supplement) and as directed by the Governor of Wyoming. Further special good time awards for participants of community corrections programs shall be implemented and managed in accordance with Board of Charities and

Reform Policy 200(A)10, *Adult Community Corrections.*

PROCEDURE

1. "Wyoming's good time and special good time law continues to apply to offenders from the state correctional facilities when they are serving their sentences in residential/nonresidential community corrections programs."
2. "Wyoming's good time and special good time law does not apply to offenders who were directly sentenced to the community corrections program by a district judge."
3. "The director of the community program will make recommendations to the Warden who will award the special good time."

MACY, Justice, dissenting.

The majority conclude that "there is nothing in [§ 7–13–201] which requires any fixed period of time between the minimum and maximum" sentences; therefore, the sentence imposed in this case is "indeterminate and legal." I do not agree.

"Indeterminate sentence" is defined as: "A form of sentenc[ing] * * * which, instead of fixing rigidly the duration of the imprisonment, declares that it shall be for a period 'not less than' so many years "nor more than" so many years, * * * *the exact length of the term being afterwards fixed,* within the limits assigned by the court * * *, *by an executive authority* * * *." Black's Law Dictionary at 1223 (5th ed. 1979) (emphasis added).

Wyoming's statutory scheme is consistent with this definition. Section 7–13–201, W.S.1977, provides as follows:

"When a convict is sentenced to the state penitentiary, otherwise than for life, for an offense or crime, the court imposing the sentence shall not fix a definite term of imprisonment, but shall establish a maximum and minimum term for which said convict shall be held in said prison. The maximum term shall not be longer than the longest term fixed by law for the punishment of the offense of which he was convicted, and the minimum term shall not be less than the shortest term fixed by law for the punishment of the offense of which he was convicted."

In turn, § 7–13–402(a), W.S.1977, provides in pertinent part:

"The board may grant a parole, that is, permission to leave the confines of the institution in which the person is confined, to any person imprisoned in any institution under sentence ordered by any district court of this state other than a life sentence, provided the person has served the minimum term pronounced by the trial court less good time, if any, granted under rules promulgated pursuant to W.S. 7–13–423."

Finally, § 7–13–423(a), W.S.1977, provides:

"The governor, after consultation with the state board of parole and the wardens of the Wyoming state penitentiary and the women's center, shall adopt rules and regulations to establish a system of good time and special good time allowances for inmates of the state penitentiary and the women's center. The rules may provide either for good time to be deducted from the maximum sentence or for good time to be deducted from the minimum sentence imposed by the sentencing court, or both."

These statutes are in pari materia and should be construed in such a manner as to give effect to all of them. To hold that a sentence imposing a minimum term of only one day less than the maximum term is "indeterminate" as contemplated by § 7–13–201, W.S.1977, is to render §§ 7–13–402(a) and 7–13–423(a), W.S.1977, meaningless.